## RIXFORD & A. *v.* SMITH & A.

A common carrier of chattels is not bound to insure them against their own fault or the fault of their owner, and is not liable to him for loss or damage caused by an inherent defect in the thing or animal carried without any fault of the carrier, or by the manner of packing or loading, the responsibility of which the owner has assumed, or by any want of care which the owner was to exercise.

The liability of a common carrier of cattle is governed by the general legal principles applicable to the common carriage of other property.

ASSUMPSIT, by Lucius Rixford and others against J. Gregory Smith and others, the defendants, as managers of the Vt. Central and Vt. & Canada railroads, and as common carriers. It was alleged in the declaration, that the defendants contracted to carry thirty-one young cattle and cows from St. Albans, Vt., to Keene, N. H., and there deliver them; that they were not delivered seasonably, but were unreasonably detained; and that the defendants so carelessly, negligently, and unskilfully managed, attended to, cared for, and transported said cattle, that they were greatly reduced in weight and value, and several of them died in consequence thereof, and others were so bruised, trodden down, jammed, and injured that they became of little value. Plea, the general issue.

One of the plaintiffs negotiated with Kibbe, the station agent of the defendants at St. Albans, for the hiring of a car for the transportation of the cattle; agreed to pay (and subsequently paid) $68 for the use of the car, and informed Kibbe that one Rugg (of whom he had bought the cattle) would see to the loading of the car; and that he, the plaintiff, should not himself, or by any agent, accompany the train that would carry the cattle. One Keniston, employed by Rugg, drove the cattle to the St. Albans station, and, with assistance procured by, himself, loaded the car. There was evidence tending to show that when Keniston was putting the cattle into the car, Kibbe, coming along,

objected that the car was being overcrowded; inquired if anybody was going with the cattle,—and, being informed there was not, said he should not ship them except at the risk of the owners, as the car was overloaded; that Keniston told Kibbe he was only obeying instructions, and that he might ship them; and that thereupon Kibbe told him to remember what he had said, for he was afraid there would be trouble about the cattle. The plaintiffs contended that the loss, injury, and detention happened through no fault of the plaintiffs: the defendants contended that the loss and injury were occasioned solely by the fault of the plaintiffs in improperly overloading and crowding the cattle, and that they were transported with reasonable dispatch.

The defendants requested the court to instruct the jury that the defendants, as carriers of live stock, are not under the ordinary common-law liability of common carriers, but are only liable for want of ordinary care and skill, that is, for such care and skill as people in general use about their business. The court declined so to instruct the jury, but did instruct them as follows: The common-law liability of a common carrier of living animals is the same as the liability of such carrier with respect to other merchandise. Upon undertaking their transportation, the carrier assumes the obligation to deliver them safely, against all contingencies except such as would excuse the non-delivery of other property. This general rule is subject, however, to the apparent exception that the liability of the carrier does not extend to injuries caused by the peculiar character and propensities of the animals to themselves or to each other. Vicious and unruly animals may injure or destroy themselves or each other, or frightened animals may die of terror, or the animals may die of disease, notwithstanding every precaution it is possible to use. For such occurrences the carrier is not answerable. He does not absolutely warrant live freight against the consequences of its own vitality. To these instructions, and the refusal to give those requested, the defendants excepted.

The jury having failed to agree upon a verdict, a case was reserved for the purpose of settling questions of law that will arise again on another trial.

*Cushing*, for the defendants.

The court should have instructed the jury in regard to the liability of the defendants, as carriers of live stock, as requested by them. *M. S. & N. I. Co.* v. *McDonough & a.*, 5 Am. L. Rev. 178.

*Wheeler & Faulkner*, for the plaintiffs.

The instructions of the court in regard to the liability of the defendants, as carriers of live stock, were correct, and the request of the defendants was rightly refused. *Smith* v. *N. H. & N. R. Co.*, 12 Allen 531.

Doe, J. Under some circumstances, and to some extent, common carriers are insurers by force of public expediency or policy recognized by the law as equivalent to practical reasonable necessity. Such policy, amounting to such reasonable necessity, is the reason of the law of common-carriage insurance ; and the reason of the law shows when and to what extent a common carrier is an insurer. What is the reason of the law ?

" The law charges this person [the common carrier], thus intrusted to carry goods, against all events but acts of God, and of the enemies of the king. For though the force be never so great, as if an irresistible multitude of people should rob him, nevertheless he is chargeable. And this is a politic establishment, contrived by the policy of the law for the safety of all persons, the necessity of whose affairs oblige them to trust these sorts of persons, that they may be safe in their ways of dealing ; for else these carriers might have an opportunity of undoing all persons that had any dealings with them by combining with thieves, &c., and yet doing it in such a clandestine manner as would not be possible to be discovered. And this is the reason the law is founded upon in that point." Holt, C. J., in *Coggs* v. *Bernard,* 2 Ld. Raym. 909, 918.

" The question is, whether the common carrier is liable in this case of fire.  *  *  *  A carrier is in the nature of an insurer. It is laid down that he is liable for every accident, except by the act of God, or the king's enemies. Now, what is the act of God ? I consider it to mean something in opposition to the act of man : for everything is the act of God that happens by his permission ; everything, by his knowledge. But to prevent litigation, collusion, and the necessity of going into circumstances impossible to be unravelled, the law presumes against the carrier, unless he shows it was done by the king's enemies, or by such act as could not happen by the intervention of man, as storms, lightning, and tempests. If an armed force come to rob the carrier of the goods, he is liable ; and a reason is given in the books, which is a bad one, viz., that he ought to have a sufficient force to repel it : but that would be impossible in some cases, as, for instance, in the riots in the year 1780. The true reason is, for fear it may give room for collusion, that the master may contrive to be robbed on purpose, and share the spoil. In this case, it does not appear but that the fire arose from the act of some man or other. It certainly did arise from some act of man, for it is expressly stated not to have happened by lightning. The carrier therefore in this case is liable, inasmuch as he is liable for inevitable accident." Lord Mansfield, in *Forward* v. *Pittard,* 1 D. & E. 27, 33.

" In a state of society such as that we live in, in which we are supplied with the necessaries and conveniences of life by an interchange of the produce of the soil and industry of every part of the world, so much property must be entrusted to carriers that it is of great importance that the laws relating to the carriage of goods should be rendered simple and intelligible ; and that they should be such as to

provide for the safe conveyance of property, and at the same time protect the carrier against risks, the extent of which he cannot know, and therefore cannot determine what precautions are proper for his security. * * * When goods are delivered to a carrier, they are usually no longer under the eye of the owner: he seldom follows or sends any servant with them to the place of their destination. If they should be lost or injured by the grossest negligence of the carrier or his servants, or stolen by them or by thieves in collusion with them, the owner would be unable to prove either of these causes of loss : his witnesses must be the carrier's servants, and they, knowing that they could not be contradicted, would excuse their masters and themselves. To give due security to property, the law has added to that responsibility of a carrier which immediately rises out of his contract to carry for a reward, namely, that of taking all reasonable care of it, the responsibility of an insurer. From his liability as an insurer the carrier is only to be relieved by two things, both so well known to all the country when they happen, that no person would be so rash as to attempt to prove that they had happened when they had not, namely, the act of God and the king's enemies." BEST, C. J., in *Riley* v. *Horne*, 5 Bing. 217.

" This law is enforced on principles of public policy, to prevent fraud and collusion with thieves and robbers,—the owner of the goods, not being generally in a situation to oversee and protect his property, having placed it in the possession and under the control of the carrier : and the pay of carriers is graduated upon such liability." HUBBARD, J., in *Thomas* v. *B. & P. R. Co.*, 10 Met. 472, 476.

" The case of a carrier stands upon peculiar grounds. He is held responsible as an insurer of the goods, to prevent combinations, chicanery, and fraud." SPENCER, J., in *Roberts* v. *Turner*, 12 Johns. 232, 233.

" The law in relation to carriers has in some instances operated with severity, and they have been charged with losses against which no degree of diligence could guard. But cases of this description are comparatively of rare occurrence ; and the reason why they are included in the rule of the common law is, not because it is fit in itself that any man should answer without a fault, but because there are no means of effectually guarding the public against imposition and fraud, without making the rule so broad that it will sometimes operate harshly." BRONSON, J., in *Hollister* v. *Nowlen*, 19 Wend. 234, 240.

" The reason for this distinction [between a carrier of goods and a carrier of passengers] was given at an early period. It is, that in consequence of the public nature of his employment and the danger of collusion with plunderers, it is necessary to regard a common carrier as an insurer. * * * The necessity of the application of a stringent rule to simplify and define the responsibilities of common carriers has been repeatedly declared." GILCHRIST, C. J., in *Elkins* v. *B. & M. R. Co.*, 23 N. H. 275, 285.

" The reasons upon which the strict rule of the common law was

founded are extremely obvious, and have been often stated. While the goods are in the course of transportation, the carrier has the sole charge of them, and the owner has no power to protect his property by any care of his own. The carrier has the most tempting opportunities for embezzlement, and for fraudulent collusion with others. It would be extremely difficult in all cases, and in many cases quite impossible, for the owner to prove the fraud or negligence by which his goods had been lost. The policy of the law imposed the loss upon the party to whose fidelity and care the property was entrusted, and thus encouraged the utmost diligence, where negligence, if it existed, could seldom be detected. This simple and uniform rule fixed the rights of the parties, and prevented dispute and litigation. The reasons for adhering to the ancient rule still exist in unabated force. Collusion with thieves and robbers is perhaps less to be apprehended now than in the rude times when the rule was first established. But, on the other hand, the immense increase of the business, the inestimable value of the commodities now entrusted to the charge of common carriers, and the vast distances to which they are transported, have multiplied the difficulties of the owner who seeks to recover for the loss of his goods, and have added greatly to the opportunities and temptations of the carrier who might be disposed to neglect or violate his trust. On the whole, we are not able to see any change in the business of common carriers which calls for a modification of the old rule. Nor does there appear to be any real hardship in the application of this rule to the common carrier. The price of transportation will include a reasonable premium for this kind of insurance. The rule being uniform and well understood, in this as in other similar cases, the rate of compensation regulates itself; and the loss, if no fault can be charged anywhere, will be cast, on principles of true policy, upon the party whose diligence and care will be encouraged and stimulated by the risk." Perley, J., in *Moses* v. *B. & M. R.*, 24 N. H. 71, 84, 85.

While the authorities give an idea of the reason of the law of common-carriage insurance sufficiently accurate for ordinary practical purposes, they exhibit the difficulty of condensing the whole reason in a brief formula, or even expressing it in many words with absolute precision. The dangers of embezzlement and collusion with thieves, generally given as the reason, might be sufficient when the property is lost, but not when (as in the present case) it is delivered at its place of destination in a damaged condition. The carrier's exclusive possession of evidence, the difficulties under which the bailor might labor in discovering and proving the carrier's fault, his inability to contradict the carrier's witnesses, the necessity of avoiding the investigation of " circumstances impossible to be unravelled," the importance of stimulating the care and fidelity of the carrier, and the convenience of a simple, intelligible, and uniform rule in so extensive a business, would constitute a much broader ground. The reason is such as shows that it is better for the bailor to be compelled to pay the carrier a premium for insurance against certain dangers of transportation beyond the

power of the carrier to avert, than to bear the risk himself. The reason is such that it does not apply to the transportation of a passenger, and does apply, under some circumstances, and to some extent, to the transportation of his baggage. It is said to generally include property destroyed by fire not caused by lightning : but it does not include property burned by its owner. It does not extend to property lost or injured by the fault of the owner. *Whalley* v. *Wray*, 3 Esp. 74 ; *Edwards* v. *Sherratt*, 1 East 604, 609, 610 ; *G. W. R. Co.* v. *Talley*, 23 L. T., N. S. 413 ; *White* v. *W. Co.*, 7 Cush. 155 ; *Tower* v. *U. & S. R. Co.*, 7 Hill 47 ; 2 Kent's Com. 603.

It does not apply to those rights of service of children or apprentices, which are rights of property, nor to chattel slaves. "A slave has volition, and has feelings which cannot be entirely disregarded. These properties cannot be overlooked in conveying him from place to place. He cannot be stowed away as a common package. Not only does humanity forbid this proceeding, but it might endanger his life or health. Consequently, this rigorous mode of proceeding cannot safely be adopted, unless stipulated for by special contract. Being left at liberty, he may escape. The carrier has not and cannot have the same absolute control over him that he has over inanimate matter. In the nature of things, and in his character, he resembles a passenger, not a package of goods. It would seem reasonable, therefore, that the responsibility of the carrier should be measured by the law which is applicable to passengers, rather than by that which is applicable to the carriage of common goods." MARSHALL, C. J., in *Boyce* v. *Anderson*, 2 Peters 150, 154, 155 ; *Clark* v. *M'Donald*, 4 McCord 223.

The case of slaves, carried for their owner as his property, puts in a strong light the reasonable and logical character of this branch of the law, and the necessity of considering the nature of the property, and, to some extent, the nature of the loss or injury, when the question of insurance is raised. Slaves are property, as cattle are : they may run away from the carrier ; they may have as strong inducements as cattle can have to escape ; they may maim themselves, or commit suicide, or die natural deaths, in the carrier's possession ;—and if in any of these ways their owner suffers a loss of what the law regards as valuable property, the carrier, if without fault, is not liable. . And many other cases illustrate the legal principle, which can be well elucidated by examples, and is suggested, but not fully explained, by the short general rule and two exceptions in common use. A common carrier of menageries might be held to insure against such external dangers as those of collision of trains, running off the track, breaking bridges, car-wheels, or other machinery of the carrier, and against certain inevitable accidents not caused by the uncontrollable character of the freight ; but such an internal danger as that of a bailor's wild beasts destroying each other in his cage, in which they were received by the carrier, and in which they were to be transported by him, would not come within the reason of the law of common-carriage insurance. The fault would be in the freight or in packing it, and, in either case,

would be, in a certain sense, the fault of the bailor. And although the fault were apparent and known to the carrier, it would not be his duty to remedy it by repacking. The sending of such freight in cages would be an order of the bailor to carry it packed as it was. So, in the present case, the plaintiffs were not insured against damage caused by their own fault. If they had hired thirty-one sufficient cars, and put one animal only in each car, there would have been no damage from their injuring each other. And when the plaintiffs hired one car, and caused thirty-one cattle to be put into it, they did not understand that any part of the $68 which they paid for the use of the car was a premium for insurance against the natural and necessary consequences of their own acts. *Kimball* v. *R. & B. R. Co.*, 26 Vt. 247. The defendants, furnishing such accommodations as the plaintiffs desired, or as good as they were willing to pay for, were not in fault for the mode of transportation chosen by the plaintiffs. Sending live cattle or allowing them to be sent on a railroad, in cars loaded in the usual manner, is not an exercise of a high degree of care for the safety and welfare of the animals. It may be, financially, a judicious thing for the owner to do. His profits may exceed his losses. But there is a degree of negligence, not to say cruelty, on the part of the owner in such a transaction, against which the carrier is not required to insure him.

When a common carrier is an insurer by force of his public, official, common law duty, he can refuse to carry unless he is paid a premium for insurance: he can insist upon his right to insure, and the bailor can insist upon his right to be insured by the carrier. This kind of insurance is not an independent transaction, optional with each party, but an incident of common carriage, and separable from it only by mutual agreement. Such insurance, including the right to insure and the right to be insured, is founded upon principles very different, in some respects, from those of fire, marine, and life insurance. Its object is material to be considered; and its object is merely subsidiary to that of transportation. When a man delivers fruit, vegetables, milk, butter, eggs, meat, fish, live animals, or other perishable property, to a common carrier, his object is transportation, and not insurance against the irresistible operation of the laws of nature. His object is, a certain change in the locality of his property,— not an insurance, for a certain time, against all change in its character and condition. The warranty he desires is of the safety of the transportation, not of the absolute preservation of his property from its own action.

Not only is the owner of chattels sent by a common carrier not insured by the carrier against their explosion *(Parrot* v. *Wells*, 15 Wal. 524), fermentation, putrefaction, dissolution, spontaneous combustion, growth, decay, disease, or death, but he may be liable to the carrier for damage caused by such natural processes, or by the insufficiency of his casks, boxes, or fastenings, or other undisclosed unfitness of his property for the journey on which it is sent. Instead of

being insured against his own negligence, he may be answerable for injuries which it inflicts upon the carrier.

If the reason of the law of compulsory common carriage insurance were merely a difficulty of proof, it might reach a case where the fault was in the freight or its owner. When property is delivered in a damaged condition at its place of destination, it may sometimes be as difficult for the owner to prove that the damage was caused by the carrier's negligence, or to rebut the carrier's evidence on that point, as to prove that goods not delivered by the carrier had been lost by his negligence. But the reason of the law has some regard for the fundamental principles of justice as well as the demands of convenience. And it would be contrary to all legal reason, whether of natural justice, public policy, or private convenience, to empower an owner of property to compel a common carrier to insure it against the fault of the owner, or against such a fault of the property as must be considered the fault of the owner. Such a system of insurance would encourage fraud, and unreasonably increase the premium which the whole community must pay.

So far as the contract in this case was to be performed in Vermont, it would seem that it would be governed by the law of that State. *Barter* v. *Wheeler*, 49 N. H. 9, 29 ; *Gray* v. *Jackson*, 51 N. H. 9, 39. And *Kimball* v. *R. & B. R. Co.*, 26 Vt. 247, would seem to be an important authority concerning the law of Vermont.

The instructions given to the jury were taken from *Smith* v. *N. H. & N. R. Co.*, 12 Allen 531, 533 ; and, so far as the case may be governed by the law of New Hampshire, they are substantially correct. What was stated as an apparent exception, seems to us to be, as suggested in *Smith* v. *N. H. & N. R. Co.*, an application of the general rule : and the general rule is amply sustained by authority. 2 Redfield on Railways, secs. 176, 4 ; 2 Greenl. Ev., sec. 220 ; Story on Bailm., secs. 492 a, 563, 565, 566, 576; *Leech* v. *Baldwin*, 5 Watts 446 ; *Hall* v. *Renfro*, 3 Met. (Ky.) 51 ; *Clarke* v. *R. & S. R. Co.*, 14 N. Y. 570 ; *M. S. & N. I. R. Co.* v. *McDonough & a.*, 21 Mich. 165–210 ; *Richardson & a.* v. *N. E. R. Co.*, L. R., 7 C. P. 75 ; *Blower* v. *G. W. R. Co.*, *id.* 655.

In the latter case, WILLES, J., said,—" The question for our decision is, whether the defendants, upon the facts and findings of the county court judge, are liable as common carriers for the loss of this animal. Whether a railway company are common carriers of animals, is a question upon which there has been much conflict of opinion ; and although there may be difficulties in determining that question, such as induced Lord WENSLEYDALE, in *Carr* v. *L. & Y. R. Co.*, to make the observations which have elicited remarks from some learned judges apparently to the contrary, it may turn out after all to be a mere controversy of words. The question as to their liability may turn on the distinction between accidents which happen by reason of some vice inherent in the animals themselves, or disposition producing unruliness or phrensy, and accidents which are not the result of inherent vice or

unruliness of the animals themselves. It comes to much the same thing, whether we say that one who carries live animals is not liable in the one event but is liable in the other, or that he is not a common carrier of them at all, because there are some accidents other than those falling within the exception of the act of God and the queen's enemies for which he is not responsible. By the expression ' vice,' I do not, of course, mean moral vice in the thing itself or its owner, but only that sort of vice which, by its internal development, tends to the destruction or the injury of the animal or thing to be carried, and which is likely to lead to such a result. If such a cause of destruction exists and produces that result in the course of the journey, the liability of the carrier is necessarily excluded from the contract between the parties. This becomes more clear when we consider the reason why a common carrier is liable for a loss, though happening without any negligence at all on his part, unless in the case of the act of God or the queen's enemies. * * * A common carrier is liable, as an ordinary bailee, for negligence ; and he is liable for a loss occasioned by negligence, even though the act of God or of the queen's enemies conduce to the loss. But he is further liable as an insurer for losses which occur through no negligence on his part. It is only necessary, therefore, to observe that an insurer is not liable for accidents happening through the inherent vice of the thing insured, but only for such as happen through adventitious causes."

It seems to us correct to say that, by an elementary general principle of the law of common carriage insurance, a common carrier of live animals is not bound to insure them against inevitable accidents caused by their own fault or vice, in the sense explained by Mr. Justice WILLES. And we do not see how this principle can relieve the carrier from the liability of an insurer on other points, to which this principle has no application. He may still be bound to insure against inevitable accidents caused by defects in his road, track, cars, and machinery, and against loss by embezzlement, theft, and trespass, when he has such exclusive possession and control of the property carried as require him to be an insurer in those particulars, on the ground of that public expediency or policy, recognized by the law as equivalent to a practical reasonable necessity, which is the reason of the law, and the foundation of the whole doctrine of this compulsory kind of insurance. *Palmer* v. *G. J. R. Co.*, 4 M. & W. 749, 758 ; *Brind* v. *Dale*, 8 C. & P. 207 ; *Willoughby* v. *Horridge*, 12 C. B. 742 ; *Martin* v. *G. I. P. R. Co.*, L. R., 3 Exchq. 9 ; *White* v. *W. Co.*, 7 Cush. 155 ; *N. J. S. N. Co.* v. *Merchants' Bank*, 6 How. 344.

" Where, however, the cause of the damage for which recompense is sought is unconnected with the conduct or propensities of the animal undertaken to be carried, the ordinary responsibilities of the carrier should attach. * * * Considering the law of carriers to be established upon considerations of sound policy, we would not depart from it, except where the reason upon which it is based wholly fails, and then no further than the cause for the exception requires." DENIO,

C. J., in *Clarke* v. *R. & S. R. Co.*, 14 N. Y. 570, 574. When the rule is applied as far as the reason of it requires, and no further, there is no departure from the law, and no exception to the rule. The general principle does not transcend the bounds of the sound policy upon which it is based. The legal structure, in its length and breadth, is coextensive with its foundation. Where the reason of the law stops, the law itself stops.

The decisions directly in point are much less numerous than they would have been but for an unfortunate innovation introduced in Westminster hall. The English courts having adopted a new and erroneous doctrine, giving effect to notices and conditions by which common carriers sought to limit their common law liability, " the rule of the common law has been substantially restored " by parliament. *Moses* v. *B. & M. R.*, 24 N. H. 71, 87 ; *Hollister* v. *Nowlen*, 19 Wend. 234, 237, 241, 242, 243, 248, 249, 250. By the Railway and Canal Traffic Act of 1854, 17 and 18 Vict., ch. 31, sec. 7, such notices and conditions of railway or canal companies are declared void, except such conditions as `shall be adjudged to be just and reasonable by the court ; and no special contract between any such company and any other parties, respecting transportation, is binding upon any such party, unless signed by him or by the person delivering the property for carriage. Such conditions, to be binding, must not only be, in the opinion of the court, just and reasonable, but must also be embodied in a special contract in writing, signed by the owner, bailor, or person delivering the goods to such company. *Simons* v. *G. W. R. Co.*, 18 C. B. 805 ; *L. & N. W. R. Co.* v. *Dunham, id.* 826 ; *Aldridge* v. *G. W. R. Co.*, 15 C. B. (N. S.) 582 ; *Peek* v. *N. S. R. Co.*, Ellis, B. & E. 958 ; S. C. *id.*, 986 ; S. C., 4 B. & S. 1005—10 H. L. Cas. 473. " The intention of the legislature in passing the act in question (17 and 18 Vict. ch. 31) was, to place the whole railway system under the control of the court." JERVIS, C. J., in *L. & N. W. R. Co.* v. *Dunham*, 18 C. B. 826, 829. English cases abound in, and generally turn on notices, conditions, special contracts, and statutes. So far as they show what are regarded in England as just and reasonable conditions, they may be of some value in this country. But the errors that prevailed there before the interposition of parliament, and the modified forms in which the common law has been restored by legislation, prevent our receiving much of that assistance which would have been afforded by the English authorities, had there been no departure from the old law in that country. *Hinton* v. *Dibbin*, 2 A. & E. (N. S.) 646 ; *Shaw* v. *Y. & N. M. R. Co.*, 13 A. & E. (N. S.) 347 ; *Austin* v. *M. S. & L. R. Co.*, 10 C. B. 454; *Austin* v. *M. S. & L. R. Co.*, 16 A. & E. (N. S.) 600 ; *Carr* v. *L. & Y. R. Co.*, 7 W. H. & G. 707 ; *Walker* v. *Y. & N. M. R. Co.*, 2 E. & B. 750 ; *Beal* v. *S. D. R. Co.*, 5 H. & N. 875`; S. C., 3 H. & C. 337 ; *Y. N. & B. R. Co.* v. *Crisp*, 14 C. B. 528 ; *Hughes* v. *G. W. R. Co., id.* 637 ; *Slim* v. *G. N. R. Co., id.* 647 ; *MacAndrew* v. *E. Telegraph Co.*, 17 C. B. 3 ; *Wise* v. *G. W. R. Co.*, 1 H. & N. 63 ; *Pardington* v. *S. W. R. Co., id.* 392 ; *White* v.

*G. W. R. Co.*, 2 C. B. (N. S.) 7 ; *M'Manus* v. *L. & ·Y. R. Co.*, 2 H.
& N. 693 ; S. C., 4 H. & N. 327 ; *Coxon* v. *G. W. R. Co.*, 5 H. & N.
274 ; *Lewis* v. *G. W. R. Co.*, *id.* 867 ; *Harrison* v. *L. B. & S. C. R.
Co.*, 2 B. & S. 122 ; S. C., *id.* 152 ; *M' Cance* v. *L. & N. W. R. Co.*,
7 H. & N. 477 ; *Garton* v. *B. & E. R. Co.*, 1 B. & S. 112 ; *Gregory*
v. *W. M. R. Co.*, 2 H. & C. 944 ; *Hodgman* v. *W. M. R. Co.*, 5 B. &
S. 173 ; *Allday* v. *G. W. R. Co.*, *id.* 903 ; *Chippendale* v. *L. & Y. R.
Co.*, 7 Railway Cas. 824—15 Jur. 1106—12 L. J., Q. B. 22 ; *G. N. R.
Co.* v. *Morville*, 7 Railw. ·Cas. 830—16 Jur. 528—21 L. J., Q. B. 319 ;
*Lloyd* v. *W. & L. R. Co.*, 15 Irish C. L. 37 ; *Dodson* v. *G. T. R. Co.*,
7 Canada L. J. (N. S.) 263 ; *P. & O. S. N. Co.* v. *Sand*, 3 Moore P.
C. C. (N. S.) 272 ; *Baxendale* v. *G. E. R. Co.*, 10 B. & S. 212 ; *Red-
mayne* v. *G. W. R. Co.*, L. R., 1 C. P. 329 ; *Lord* v. *M. R. Co.*, L. R.,
2 C. P. 339 ; *Rooth* v. *N. E. R. Co.*, L. R., 2 Exchq. 173 ; *Zunz* v.
*S. E. R. Co.*, L. R., 4 Q. B. 539.

*Case discharged.*