2000 ME 76

**Carroll E. DECKER and Donna Decker**

v.

**NEW ENGLAND PUBLIC WAREHOUSE, INC. and S.D. Warren Co.**

Supreme Judicial Court of Maine.

Argued March 6, 2000.
Decided April 28, 2000.

John A. Hobson (orally), Gregory B. Poitras, Perkins, Thompson, Hinckley & Keddy, Portland, for plaintiffs.

David P. Very (orally), Jonathan W. Brogan, Norman, Hanson & DeTroy, LLC, Portland, for N.E. Public Warehouse.

Thomas V. Laprade (orally), Philip M. Coffin III, Lambert, Coffin, Rudman & Hochman, Portland, for S.D. Warren Co.

Before WATHEN, C.J., and CLIFFORD, RUDMAN, SAUFLEY, ALEXANDER and CALKINS, JJ.

RUDMAN, J.

[¶ 1] Carroll and Donna Decker appeal from a summary judgment entered in the Superior Court (Cumberland County, *Mills, J.*) in favor of both New England Public Warehouse, Inc. (NEPW) and S.D. Warren Co. The Deckers contend that the Superior Court erred by finding (1) that NEPW and S.D. Warren owed no duty of care to properly load Carroll Decker's tractor trailer; and (2) that no genuine issue of material fact existed concerning the latent danger of improperly loading the truck's cargo. We disagree and affirm the judgment.

## I. FACTS

[¶ 2] The affidavits and dispositions submitted in support of the motion for summary judgment may be summarized as follows: Carroll Decker drove tractor trailer rigs for his employer, R.D. Roy Transport, Inc. On January 28, 1993, Decker picked up a trailer loaded with paper pulp bales from the New England Public Warehouse premises in South Paris for delivery to the S.D. Warren mill in Westbrook. NEPW had contracted with R.D. Roy to carry the pulp bales to S.D. Warren's mill. This first delivery of pulp proceeded without incident. Meanwhile, another R.D. Roy employee, Clement Theriault, went to NEPW to pick up a different load of paper pulp. While at NEPW, Theriault observed NEPW employees load his trailer; he recognized that the trailer was loaded so that the bales of pulp were loaded in a "contiguous configuration." This contiguous configuration meant that the bales were stacked four-high and placed side-by-side at the ends of the trailer and single file down the center of the trailer. Using a contiguous configuration was a change from the way pulp bales had been previously loaded by NEPW on R.D. Roy trucks. Previously, a "spaced configura-

tion" had been used in which bales were placed side-by-side at the ends of the trailer, but no bales were placed between the stacked bales at front and back. S.D. Warren had asked that the contiguous configuration be used for shipping the pulp. Decker had previously asked that NEPW pack the load using a spaced configuration on his first trip on January 28, and NEPW followed that request.

[¶ 3] Theriault did not mention any concerns about the configuration of the load to anyone at NEPW. Instead, Theriault signed the bill of lading and drove the load to R.D. Roy's terminal in Oxford. At the R.D. Roy site, Decker received the bill of lading and inspected the load. Decker had not seen this load of pulp prior to this inspection and he had not been with Theriault at NEPW's facilities. Decker inspected the load by looking inside the trailer from ground level; he did not step up into the trailer to view the configuration of the bales because "the load looked like it was safe." Decker later stated that the second trailer he was to drive to S.D. Warren's mill, "looked the same way the first one did when I loaded the first one that morning. It looked exactly the same." From his vantage point on the ground, however, Decker could not see past the bales stacked side-by-side at the rear of the trailer into the balance of the trailer. Decker did not discuss the cargo or how it had been loaded with Theriault or anyone else, because "there was nobody around." According to R.D. Roy's long-standing policy and its current driver handbook, the truck operator has the ultimate responsibility for ensuring that cargo has been loaded safely.

[¶ 4] At approximately 10:00 A.M., Decker departed the R.D. Roy terminal with the loaded trailer. He travelled from Oxford to the entrance of the Maine Turnpike at Exit 11 at Gray, and proceeded down the curved entrance ramps at approximately 15 to 25 miles per hour. Decker used a "jake brake" to control his speed

while driving down the ramp.[1] As Decker began to go around a curve on the exit ramp, he heard a "thump, thump" sound from the trailer part of the truck. Soon after Decker heard the sound, the tractor trailer rolled over and crashed. No skid marks were found on the ramp after the accident. Prior to this accident, Decker had no physical disabilities which impacted his duties as a tractor-trailer driver. No evidence of mechanical defect was discovered after the accident in any part of the tractor trailer combinations Decker drove on January 28.

[¶ 5] The Deckers brought suit against NEPW alleging negligence in loading the trailer. The Superior Court later permitted the Deckers to amend their complaint to add S.D. Warren as a defendant. After significant discovery, both NEPW and S.D. Warren moved for a summary judgment. The court granted S.D. Warren's motion. After partially granting NEPW's motion as well, the court then granted the Deckers' motion to amend the judgment. NEPW subsequently asked for reconsideration and judgment as a matter of law, which the court granted. The Deckers then filed this appeal.

## II. REVIEW OF A SUMMARY JUDGMENT

[¶ 6] A summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, referred to in the statements required by Rule 7(d) show that there is no genuine issue as to any material fact set forth in those statements and that any party is entitled to a judgment as a matter of law. *See* M.R. Civ. P. 56(c).

We review the entry of a summary judgment for errors of law, viewing the evidence in a light most favorable to the party against whom the summary judgment was entered. We undertake an independent review of the record to determine if there is a genuine issue of material fact and if the moving party was entitled to a judgment as a matter of law.

*Searles v. Trustees of St. Joseph's College,* 1997 ME 128, ¶ 4, 695 A.2d 1206, 1208 (citations omitted); *Denman v. Peoples Heritage Bank, Inc.,* 1998 ME 12, ¶ 3, 704 A.2d 411, 413. Like the trial court, we consider "only the portions of the record referred to, and the material facts set forth, in the Rule 7(d) statements." *Gerrity Co., Inc. v. Lake Arrowhead Corp.,* 609 A.2d 293, 295 (Me.1992) (citation omitted). If the evidence is merely colorable, or is not significantly probative, a summary judgment may be granted. *See Green v. Cessna Aircraft Co.,* 673 A.2d 216, 218 (Me.1996).

## III. THE DUTY TO LOAD PROPERLY

[¶ 7] The first element any plaintiff must satisfy in a negligence action is that the defendant violated the applicable duty of care owed to the plaintiff. *See Jackson v. Tedd–Lait Post No. 75, American Legion,* 1999 ME 26, ¶ 7, 723 A.2d 1220, 1221. The scope of the duty owed by a defendant "is, initially, a matter of law." *Cameron v. Pepin,* 610 A.2d 279, 282 (Me. 1992). We consider several factors when determining if the defendant owes a duty. Generally, the policy concerns fall into these broad categories: "the hand of history, our ideals of morals and justice, convenience of administration of the rule, and our social ideas as to where the loss should fall." *Id.* (quoting *Trusiani v. Cumberland & York Distributors, Inc.,* 538 A.2d 258, 261 (Me.1988)).

[¶ 8] The duty issue in this case is one of first impression in Maine. The Deckers assert that both NEPW and S.D. Warren, as shipper and consignee respectively,

---

1. A jake brake reduces the revolutions of the engine as a way to slow the truck. This enables the driver to slow the truck without applying the wheel brakes. *See Syrie v. Schilhab,* 693 So.2d 1173, 1178 (La.1997).

owed a duty to Decker to properly load the pulp bales into Decker's trailer. Based upon the persuasive reasoning found in *United States v. Savage Truck Line, Inc.*, 209 F.2d 442 (4th Cir.1953), we disagree.

[¶ 9] The rule propounded in *Savage* typically assigns to the carrier, here R.D. Roy and its drivers, the ultimate duty of care to ensure proper loading of cargo it carries. The *Savage* opinion succinctly states the test:

> When the shipper assumes the responsibility of loading, the general rule is that he becomes liable for the defects which are latent and concealed and cannot be discerned by ordinary observation by the agents of the carrier; but if the improper loading is apparent, the carrier will be liable notwithstanding the negligence of the shipper.

209 F.2d at 445. The policy behind the *Savage* rule is well founded. The everyday practice and understanding in the trucking industry, as aptly reflected in the federal regulations on the subject,[2] reflect that carriers logically should have the final responsibility for the loads they haul. No shipper, such as NEPW, can force a driver to accept a load that the driver believes is unsafe. *See* 49 C.F.R. § 392.9(b)(1) (2000). By the same token, a driver must take responsibility for the safety of his or her cargo by inspecting and securing the load. *See* § 392.9(b)(2). The *Savage* rule does not absolve shippers from all responsibility as they bear the onus when cargo has been loaded improperly and that defect is latent. The *Savage* rule simply extends the indus-

2. For example, the U.S. Department of Transportation regulates commercial motor carriers through rules governing the safe loading of tractor trailers and other types of commercial trucks. The administrative rule which applies here reads, in full:

§ 392.9 Safe loading.

(a) **General.** No person shall drive a commercial motor vehicle and a motor carrier shall not require or permit a person to drive a commercial motor vehicle unless—

(1) The commercial motor vehicle's cargo is properly distributed and adequately secured as specified in §§ 393.100–393.106 of this subchapter.

(2) The commercial motor vehicle's tailgate, tailboard, doors, tarpaulins, its spare tire and other equipment used in its operation, and the means of fastening the commercial motor vehicle's cargo are secured; and

(3) The commercial motor vehicle's cargo or any other object does not obscure the driver's view ahead or to the right or left sides, interfere with the free movement of his/her arms or legs, prevent his/her free and ready access to accessories required for emergencies, or prevent the free and ready exit of any person from the commercial motor vehicle's cab or driver's compartment.

(b) **Drivers of trucks and truck tractors.** Except as provided in paragraph (b)(4) of this section, the driver of a truck or truck tractor must—

(1) Assure himself/herself that the provisions of paragraph (a) of this section have been complied with before he/she drives that commercial motor vehicle;

(2) Examine the commercial motor vehicle's cargo and its load-securing devices within the first 25 miles after beginning a trip and cause any adjustments to be made to the cargo or load-securing devices (other than steel strapping) as may be necessary to maintain the security of the commercial motor vehicle's load; and

(3) Reexamine the commercial motor vehicle's cargo and its load-securing devices periodically during the course of transportation and cause any adjustments to be made to the cargo or load-securing devices (other than steel strapping) as may be necessary to maintain the security of the commercial motor vehicle's load. A periodic reexamination and any necessary adjustments must be made—

(i) When the driver makes a change of his/her duty status; or

(ii) After the commercial motor vehicle has been driven for 3 hours; or

(iii) After the commercial motor vehicle has been driven for 150 miles, whichever occurs first.

(4) The rules in this paragraph do not apply to the driver of a sealed commercial motor vehicle who has been ordered not to open it to inspect its cargo or to the driver of a commercial motor vehicle that has been loaded in a manner that makes inspection of its cargo impracticable.

49 C.F.R. § 392.9 (2000).

try's reasonable understanding to negligence suits involving carriers and shippers.[3]

[¶ 10] Initially, the *Savage* rule applied solely to damage caused to the cargo being shipped. *See generally* M.C. Dransfield, Annotation, *Liability of Carrier by Land or Air for Damage to Goods Shipped Resulting from Improper Loading*, 209 F.2d 442, 44 A.L.R.2d 984 (1953). In subsequent years, courts extended the *Savage* reasoning to include personal injuries to employees of carriers caused by the negligent loading of goods. *See General Electric Co. v. Moretz*, 270 F.2d 780, 785–87 (4th Cir.1959); *Georgia Kraft Co. v. Terminal Transport Co.*, 343 F.Supp. 1240, 1247 (E.D.Tenn.1972). Most courts now accept the rationale of *Savage* and require carriers to take responsibility for the loads they carry, even if those loads have been improperly loaded by others. *See id.*

[¶ 11] The reasoning in *Savage* comports with the established duty of care notion that an injury must be foreseeable before a duty attaches. *See Colvin v. A R Cable Services–ME, Inc.*, 1997 ME 163, ¶ 7, 697 A.2d 1289, 1290–91. Here, the carrier has the opportunity to intercept any problem through inspection. In fact, the carrier's driver is under the obligation to conduct such a safety inspection pursuant to federal law. *See* § 392.9(b)(2). Carriers, through their drivers, must ensure the safety of their own loads, even when cargo is loaded by shippers. The *Savage* rule that imposes liability on carriers for the loading done by shippers, even when negligent, has been accepted by the majority of modern courts and by federal regulators. After considering both industry practice and traditional duty of care jurisprudence, we accept its reasoning as well. NEPW and S.D. Warren may only be liable if Decker's tractor trailer was loaded negligently and that negligence was undiscoverable through a reasonable safety inspection.

## IV. LATENCY OF IMPROPER LOADING

[¶ 12] The exception to the general rule laid out by *Savage* occurs when the shipper loads cargo negligently and those loading defects are latent and concealed so that a reasonable inspection of the load by the carrier will not uncover the shipper's negligence. *See Symington v. Great Western Trucking Co.*, 668 F.Supp. 1278, 1282 (S.D.Iowa 1987). Additionally, some courts have cautioned that, "[w]hat is patent may depend in part upon the experience of the observer." *Alitalia v. Arrow Trucking Co.*, 977 F.Supp. 973, 984 (D.Ariz.1997). The *Savage* rule does not demand abnormal scrutiny from carriers. It matters little if an extensive carrier inspection would have uncovered the shipper's negligent loading if a reasonable inspection by the carrier did not disclose the problem.

[¶ 13] We must, therefore, determine whether the Deckers have presented enough evidence of latent negligent loading by the shipper to withstand a motion for a summary judgment. *See Green*, 673 A.2d at 218. While Decker did look into his trailer before driving, the side-by-side placement of bales at the rear of the trailer obstructed his view into the rest of the cargo hold from ground level. Decker could have attempted to get a view of the interior of the trailer, but he did not do so because "the load looked like it was safe." Decker was an experienced driver for an established carrier who had previously asked that a spaced configuration be used.

---

**3.** The situation would be markedly different in a case involving a party outside of the trucking industry. Pedestrians and non-commercial motorists, to name two possible third parties, injured in an accident caused by a shipper's negligent loading of cargo would still be able to sue that shipper for compensation despite the *Savage* rule. Shippers could not rely on *Savage* to bar claims from those not involved in the industry and who had no opportunity to remedy any negligence. Neither could a shipper escape liability when it loaded a sealed cargo hold and instructed the carrier not to inspect the load. *See* § 392.9(b)(4).

On a trip earlier during the same day as the accident, Decker instructed NEPW to load his trailer using the spaced configuration and they had complied. Before driving off with the second, fateful load of pulp, Decker conducted only a cursory review of his load since it "looked the same way the first one did when I loaded the first one that morning. It looked exactly the same." Decker's failure to carefully check his second load to confirm that it *was* exactly the same as the first load, not just that it *looked* the same, resulted in his failure to detect an otherwise patent defect.[4] Decker's inspection should have revealed that the pulp bales were loaded in a contiguous configuration. An inadequate inspection does not force liability onto the shippers.[5] *See Savage*, 209 F.2d at 445.

The entry is:

Judgment affirmed.

---

4. That loading the bales in a contiguous configuration was a defect at all is simply being assumed *arguendo*. Because the loading configuration was observable, although not observed, it matters not whether it was a defect. Even if the contiguous configuration is a defect. Decker's failure to properly inspect the load rendered any such negligence moot.

5. In addition to Decker's opportunity to detect the contiguous configuration of the pulp bales, Theriault watched NEPW employees load the tractor trailer at the NEPW premises. As an employee of R.D. Roy, Theriault must be considered a carrier for the purposes of the *Savage* rule. Thus, any defect cannot be considered latent to the carrier because the carrier watched the cargo being loaded. *See Sunrise Properties, Inc. v. Bacon, Wilson, Ratner, Cohen, Salvage, Fialky & Fitzgerald, P.C.,* 425 Mass. 63, 679 N.E.2d 540, 543–44 (1997) (imputing actions of one employee to his or her employer).