Grafton
No. 2002-110

JOAN M. SMART, EXECUTRIX UNDER WILL OF JOHN E. SMART & a.

v.

AMERICAN WELDING AND TANK COMPANY, INC. & a.

Argued: February 12, 2003
Opinion Issued: June 6, 2003

*Lachiatto Law Offices*, of Franklin, for the plaintiffs, filed no brief.

*Nixon Peabody, L.L.P.*, of Manchester (*W. Scott O'Connell* on the brief and orally), for defendant American Welding and Tank Company, Inc.

*Martin, Lord & Osman, P.A.*, of Laconia (*David S. Osman* and *David J. KillKelley* on the brief, and *Mr. KillKelley* orally), for defendant Thom's Transport Company, Inc.

BRODERICK, J. Defendant American Welding and Tank Company, Inc. (American) appeals from an order of the Superior Court (*Burling,* J.) denying its motion for summary judgment on the contribution claim of the

co-defendant, Thom's Transport Company, Inc. (TTC). We reverse and remand.

Viewing the evidence in the light most favorable to the nonmoving party, the trial court found the following facts. In December 1998, John Smart fell from a flatbed truck, owned and operated by TTC, while attempting to escape a rolling 1,000-gallon propane tank which he had been helping to unload. He died in February 1999, allegedly because of complications from the fall. A few days before the accident, American employees at American's facility in Jesup, Georgia, loaded TTC's flatbed trailer with propane tanks of various sizes, including four 1,000-gallon tanks. Two of these tanks were loaded in "bed racks," or indentations in the floor of the flatbed. American then placed boards across the top of the tanks and lowered the other two 1,000-gallon tanks onto the boards. The outboard sides of the top tanks were "chocked" and a board was nailed along the outside of each of the upper tanks to secure them in place. No interior chocking was used on the upper tanks. All the tanks were strapped in place in preparation for transport.

TTC's driver, Jimmy Willis, inspected the load and accepted it. While traveling to New Hampshire, Willis stopped multiple times to ensure that the load remained properly secured. He experienced no problems with the tanks during transport.

When he arrived at his first delivery site, the Dead River Company in Bristol, he met Smart, a Dead River Company employee, who offered to help him unload the tanks. Willis lifted Smart onto the tanks and instructed him to secure the boom straps to one of the top tanks and then step out of the way during the unloading. When Willis lifted the first 1,000-gallon tank off the boards, the adjacent tank did not move. As he was lowering the first tank to the ground, he heard Smart cry out. The adjacent tank had apparently begun rolling towards Smart and as he attempted to avoid it, he fell off the flatbed and landed on the ground, sustaining injuries.

Joan Smart, the decedent's wife and executrix of his estate, sued both American and TTC. She settled with TTC in February 2001, and TTC obtained a release for itself and American. TTC then pursued its contribution claim against American. *See* RSA 507:7-f (1997). This appeal concerns only the contribution claim.

At the close of discovery, American moved unsuccessfully for summary judgment, arguing that under federal law, "Willis' acceptance of the cargo for transport extinguished any duty American may have had and transferred to [TTC] all risk that the allegedly defective loading might cause damage." The trial court agreed with TTC's objection, deciding that New Hampshire did not follow the federal rule. According to the trial

court, under New Hampshire law, a common carrier is not liable for the acts of the shipper. In its order, the trial court did not reach TTC's alternative contention that the federal rule did not apply because the alleged loading defects were latent or concealed and could not have been discerned by ordinary observation.

When reviewing the denial of a motion for summary judgment, we consider the pleadings and any accompanying affidavits, and all proper inferences drawn from them, in the light most favorable to the nonmoving party. *Mahan v. N.H. Dep't of Admin. Services*, 141 N.H. 747, 748 (1997). Summary judgment will be granted when there is no genuine issue of material fact to be decided, and the moving party is entitled to judgment as a matter of law. *See id.*

The narrow legal question before us is whether the trial court erroneously ruled that New Hampshire does not follow the federal rule regarding common carrier liability for injuries caused by the defective loading of goods. The trial court concluded that New Hampshire did not follow the federal rule, relying upon *Rixford v. Smith*, 52 N.H. 355, 360 (1872).

The issue in *Rixford* was whether a railroad transporting cattle was liable to a cattle owner for negligently caring for the cattle. *Id.* at 355. The owner alleged that the carrier's negligence had caused many of the cattle to die or become so injured that they were no longer of value. *Id.* The legal question before the court was whether a carrier of cattle was subject to the general legal principles that, at that time, applied to carriers of nonperishable goods. *Id.* at 356, 358, 362-63.

At common law, "[t]he liability of an insurer was imposed upon carriers because of their exclusive control of goods shipped, and the inability of the shipper to protect the goods while in the custody of the carrier, or to establish the cause of damage." *Akerly v. Express Agency*, 96 N.H. 396, 400 (1951). In *Rixford*, the court created an exception to this rule for carriers of perishable goods, relieving them from liability for damage due to "explosion[,] fermentation, putrefaction" and the like or due "to the vicious propensities . . . of livestock, provided that the carrier's negligence did not contribute to the loss." *Id.* (quotation and ellipsis omitted). *Rixford* is thus factually distinguishable from this case.

■ More importantly, since *Rixford*, we have held that when a case involves transportation in interstate commerce, federal law governs the rights of the shipper and carrier. *Akerly*, 96 N.H. at 397. "Federal law must be applied to the facts presented in the record as this case arises from the carriage of goods in interstate commerce." *Scott v. J. J. Brady & Sons, Inc.*, 113 N.H. 65, 66 (1973). Accordingly, we hold that the trial court

erroneously denied American's motion for summary judgment on the ground that State law, not federal law, governed the rights of the parties.

■ Under federal law, "[r]esponsibility for obviously improper loading generally rests on the carrier," even though the shipper loaded the truck. *Franklin Stainless Corp. v. Marlo Transport Corp.*, 748 F.2d 865, 868 (4th Cir. 1984). "[I]f the improper loading is apparent, the carrier will be liable notwithstanding the negligence of the shipper." *United States v. Savage Truck Line*, 209 F.2d 442, 445 (4th Cir. 1953), *cert. denied*, 347 U.S. 952 (1954). If, however, the improper loading is "latent and concealed and cannot be discerned by ordinary observation by the agents of the carrier," the shipper remains liable. *Id.*

Initially, this rule, referred to as the *Savage* rule, "applied solely to damage caused to the cargo being shipped." *Decker v. New England Pub. Warehouse*, 749 A.2d 762, 767 (Me. 2000). Subsequently, courts "extended the *Savage* reasoning to include personal injuries to employees of carriers caused by the negligent loading of goods." *Id.* "Most courts now accept the rationale of *Savage* and require carriers to take responsibility for the loads they carry, even if those loads have been improperly loaded by others." *Id.*

The policy behind this rule is well-founded. As noted in *Decker*, "The everyday practice and understanding in the trucking business, as aptly reflected in the federal regulations on the subject, reflect that carriers logically should have the final responsibility for the loads that they haul." *Id.* at 766. Federal regulations prohibit a carrier from operating a motor vehicle unless the cargo is properly distributed and adequately secured. *See* 49 C.F.R. § 392.9(a)(1) (2002) (revised 2002). Federal regulations also require truck drivers to assure themselves that the cargo is properly distributed and adequately secured before driving. *See* 49 C.F.R. § 392.9(b)(1) (2002). The *Savage* rule "extends the industry's reasonable understanding," as reflected in the federal regulations, "to negligence suits involving carriers and shippers." *Decker*, 749 A.2d at 766-67.

The nature of a carrier's duty to transport goods safely is well-illustrated in *Savage*. There, the United States contracted with Savage to transport airplane engines from Virginia to Rhode Island. *Savage*, 209 F.2d at 443. Agents of the government who loaded the cylinders containing the engines on Savage's truck failed to secure the cylinders properly. *Id.* at 446. The driver observed that the cylinders were not properly fastened, but accepted the cargo and transported it. *Id.* During transport, the cylinders shifted, causing the truck to cross over into oncoming traffic. *Id.* at 443. One of the cylinders fell onto an oncoming truck and killed its driver instantly. *Id.* The driver's estate sued both Savage and the United States and recovered damages. *Id.* at 444.

On appeal, the Fourth Circuit held that even if the United States, as shipper, negligently loaded the cargo, its negligence did not relieve the carrier of its duty to the shipper to inspect and "carry the goods safely." *Id.* at 447. The court required Savage to indemnify the United States for any liability to the estate. *Id.* at 447-48.

TTC argues that *Savage* and its progeny do not apply because: (1) the accident occurred during unloading, not transporting, the cargo; and (2) the decedent was a party outside of the trucking industry. We disagree.

■ We see no reason to distinguish the duty imposed upon common carriers while transporting cargo from the duty imposed while unloading it. *See Hiller v. Goodwin*, 65 So. 2d 152, 156 (Ala. 1953) (unloading is "said to be a transportation service within the meaning of the Commerce Act"). "As a general rule, the carrier has the primary duty to . . . unload goods or inanimate freight . . . and is liable for damages resulting from its failure to perform that duty in a proper manner." 13 AM. JUR. 2D *Carriers* § 319 (1964).

■ We also reject TTC's assertion that a different rule applies to its contribution claim against American because the decedent was not a member of the trucking industry. *See Jenkins v. E. L. Long Motor Lines*, 103 S.E.2d 523, 528 (S.C. 1958) (affirming jury verdict against common carrier under State law for injuries sustained by motorist, despite shipper's negligence in loading cargo).

Alternatively, TTC contends that this case falls within the exception under the *Savage* rule for latent and concealed defects in loading. *See Savage*, 209 F.2d at 445. TTC acknowledges that the trial court found that the trailer and load were open to view because the cargo was not in a closed container and that Willis could have observed that the second layer of tanks was not internally chocked, had he chosen to look. TTC argues, however, that the loading defects were not apparent by ordinary observation, and, thus, the exception to the federal rule of carrier liability applies.

■ The trial court did not apply the *Savage* rule to this case, and, necessarily, did not decide whether the exception to the rule applied. We agree with TTC that whether a defect in loading is obvious through ordinary observation or concealed is a question of fact. *See Ebasio Services, Inc. v. Pacific Intermountain Express*, 398 F. Supp. 565, 568-69 (S.D.N.Y. 1975). Accordingly, we remand this issue to the trial court for resolution. *See Nash Family Inv. Prop. v. Town of Hudson*, 139 N.H. 595, 599 (1995).

The Federal Motor Carrier Safety Regulations do not compel a different result. *See* 49 C.F.R. §§ 392 *et seq.* The regulations are consistent with *Savage* in that they require drivers to inspect whether cargo is properly distributed and adequately secured both before driving a truck and during transport. *See* 49 C.F.R. § 392.9(b) (2002) (amended 2002). Although *Savage* predates the regulations by many years, it remains good law. *See Decker*, 749 A.2d at 767.

*Reversed and remanded.*

BROCK, C.J., and NADEAU, DALIANIS and DUGGAN, JJ., concurred.