GEORGIA KRAFT COMPANY and Liberty Mutual Insurance Company

v.

TERMINAL TRANSPORT COMPANY, Inc.

Civ. A. No. 5335.

United States District Court,
E. D. Tennessee, S. D.

June 16, 1972.

Strang, Fletcher, Carriger & Walker, Chambliss, Bahner & Crawford, Chattanooga, Tenn., for plaintiffs.

Campbell & Campbell, Chattanooga, Tenn., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

FRANK W. WILSON, District Judge.

This is an action for contractual indemnity wherein the plaintiffs seek to be indemnified by the defendant for losses sustained by the plaintiffs as a result of an accident that occurred in the course of a shipment. The case was tried by the Court sitting without a jury and the Court now enters the following findings of fact and conclusions of law upon the record in the case, including the evidence upon the trial and the briefs of the parties.

### Findings of Fact

(1) The plaintiff, Georgia Kraft Company, is a corporation organized under the laws of Delaware and having its principal place of business in Macon, Georgia. The record does not reflect the state of organization or the principal place of business of the plaintiff, Liberty Mutual Insurance Company, but it would appear that for purposes of citizenship it is a citizen of a state other than Tennessee. The facts in this regard will either be established by stipulation of the parties within ten days of the entry of these findings or otherwise the proof will be reopened to establish these matters. Pursuant to a previous order of the Court, Liberty Mutual Insurance Company was joined as a party plaintiff as the liability insurance carrier of Georgia Kraft Company and as having a beneficial interest by way of subrogation in the recovery sought in the case. The defendant, Terminal Transport Company, Inc., is a corporation organized under the laws of Indiana and having its principal place of business in Indianapolis, Indiana. The amount in controversy is in excess of $10,000.00.

(2) On or about August 24, 1963, the defendant, Terminal Transport Company, Inc., a motor freight common carrier acting pursuant to an order from Georgia Kraft Company, caused several of its motor freight trailer units to be delivered to the loading dock of the plaintiff's plant at Macon, Georgia for the purpose of loading. The unit here involved was a flatbed trailer some 91" wide and 39'8" long and having metal sides but no roof or top. The employees of Georgia Kraft Company loaded the trailer involved in this litigation with 16 rolls of liner board paper, four rolls being 50" in width and 12 rolls being 46" in width, each roll being approximately 50" in diameter and each roll weighing approximately 2500 pounds. The total load had a net weight of 39,640 pounds. The rolls were "side loaded," that is, laid horizontally upon their sides in a single row from the front to the rear of the trailer with a second row of rolls nested on top and with each roll on the top row laid in the valley formed by the rolls in the bottom row. In this manner it appears that of the 16 rolls in the load approximately nine were placed in the bottom row and seven in the top row. There is no testimony in the record by persons having any firsthand knowledge of the manner in which the rolls of paper were actually loaded upon this particular trailer, as the Georgia Kraft Company employees who loaded the trailer were not used as witnesses by either party, but testimony was given as to the usual and instructed method of loading. The usual manner of side loading was to nail two wooden chock blocks to the trailer floor at the front of the bottom row of rolls, with wooden chock blocks being nailed behind each roll as it was placed in the bottom row and with two wooden chock blocks being nailed behind the last roll. The top row of rolls were placed in the valleys formed by the bottom row. The loading instructions called for cleats consisting of 2" x 4" pieces of wood 18" in length to be nailed to the floor upon each side of each roll to prevent lateral motion. The preponderance of the evidence, as gathered at the scene of the subsequent accident, reflects that instead of using wooden cleats for this purpose, the employees of Georgia Kraft Company performing the loading

operation used blocks of corrugated paper material for these lateral cleats. Flexible steel straps 1¼" in width were then tightened lengthwise around the rolls so as to fasten all rolls into one bundle. The loading instructions called for two such straps to be used in loading rolls of paper in trailers having a roof, but for three straps to be used in loading rolls upon open top trailers. The evidence preponderates in favor of a finding that two straps were used in loading the trailer here involved and that this was a customary practice actually followed by Georgia Kraft Company in loading such trailers and that this practice was considered a safe and adequate loading procedure by those having experience in such matters.

(3) Upon completion of the loading by Georgia Kraft Company employees, a local haul tractor driver for the defendant, Terminal Transport Company, made an inspection of the load, which inspection consisted of observing the chocks at each end of the load, which were found to be in place, and testing the steel straps to ascertain that they were tight, which they were found to be. The driver made no observation regarding the lateral cleats. After fastening a tarpaulin over the load and closing and sealing the tailgate, the driver signed the bill of lading (Exhibit No. 9) and accepted the shipment for delivery by Terminal Transport Company to the consignee, United States Corrugated Fiber Box Company at Lincoln, Illinois.

(4) The bill of lading was in standard form, providing in relevant part that the defendant carrier received the shipment "in apparent good order" and "agrees to carry to its usual place of delivery at said destination . . . subject to all the terms and conditions . . . in the applicable motor carrier classification or tariff . . ." No express provision regarding indemnity is set forth in the bill of lading or in applicable I.C.C. regulations, but among other I.C.C. regulations applicable to the shipment and regarding the duties of the carrier were the following as set forth in 49 C.F.R. at § 192.9(a) and (b):

"(a) *Distribution and Securing of Load.*—No motor vehicle shall be driven nor shall any motor carrier permit or require any motor vehicle to be driven if it is so loaded, or if the load thereon is so improperly distributed or so inadequately secured, as to prevent its safe operation.

"(b) *Doors, Tarpaulins, Tailgates, and Other Equipment.* No motor vehicle shall be driven unless the tailgate, tailboard, tarpaulin, doors and all equipment and rigging used in the operation of said vehicle, and all means of fastening the load, are securely in place."

(5) Upon August 26, 1963, the tractor-trailer carrying the above shipment overturned when the load in the trailer shifted as the driver was entering a curve to his left. The accident occurred in Marion County, Tennessee, as the shipment was en route from Macon, Georgia to its destination. The preponderance of the evidence indicates that the accident occurred when the lateral thrust of the load caused the corrugated paper cleats to separate from the nails holding them to the trailer floor, permitting the load to shift to the right and causing the trailer to overturn.

(6) At the time of the accident, the tractor-trailer was being operated by a driver and a relief driver who were employees of Terminal Transport Company. The driver, John Kemp, and the relief driver, Robert Alexander, were each injured in the accident. After receiving certain benefits from their employer, Terminal Transport Company, under the Indiana Workmen's Compensation Law, they each brought negligence actions against Georgia Kraft Company in the Circuit Court for Marion County, Tennessee. In that lawsuit Georgia Kraft Company denied any negligence on the part of its employees in loading the trailer and further contended that the inspection and acceptance of the load by

the Terminal Transport Company driver constituted an intervening cause of the accident. The jury, however, found Georgia Kraft Company to be guilty of proximate negligence in the loading of the trailer and awarded a judgment against Georgia Kraft Company and in favor of John Kemp in the sum of $15,000.00 and in favor of Robert Alexander in the sum of $35,258.94. After having been affirmed upon appeal, these judgments, together with accumulated interest in the sum of $676.64 on the Kemp judgment and in the sum of $1632.54 on the Alexander judgment, were paid in full upon April 8, 1966, by Liberty Mutual Insurance Company, the liability insurance carrier for Georgia Kraft Company. Attorney fees and other expenses in the sum of $7,987.22, were incurred in the defense of these personal injury actions. The present lawsuit was then filed by Georgia Kraft Company and its insurance carrier, Liberty Mutual Insurance Company, the latter claiming under the standard subrogation clause in its insurance contract, seeking to recover from Terminal Transport Company the amount of the aforesaid judgments, interest, and expenses in the total sum of $60,550.35, contending that under the terms of the bill of lading and the above stated I.C.C. regulations, Terminal Transport Company is contractually obligated to indemnify them for all losses and expenses incurred in the aforesaid personal injury lawsuits.

*Conclusions of Law*

(1) Diversity of citizenship existing between the parties and a jurisdictional amount being in dispute, this Court would have jurisdiction of the parties and of this cause of action pursuant to 28 U.S.C. § 1332.

(2) Upon cross motions for partial summary judgment the Court has heretofore disposed of three affirmative defenses relied upon by the defendant, these affirmative defenses being (1) that this action is barred by the exclusive remedy provision of the Indiana Workmen's Compensation Law; (2) that this action is barred upon principles of res judicata or principles of judicial estoppel; and (3) that this action is barred by the Tennessee One Year Statute of Limitations applicable to personal injury actions. Concluding that this was an action for contractual indemnity only, and not an action for indemnity sounding in tort, all as conceded by the plaintiffs, the Court has heretofore found each of the foregoing affirmative defenses to be without merit as a matter of law, all for the reasons set forth in the Court's opinion entered in this case upon October 27, 1970 (Court File #21). Reference is made to the said opinion for a further statement of these matters.

(3) Since the trial of this case the defendant has filed a motion seeking to amend its answer so as to enter denials upon two items where admissions had been made in the original answer. Having considered the motion to amend, the Court is of the opinion that it should be denied. Not only do the matters now sought to be denied appear to be of wholly collateral significance, if in fact of any significance, but it would appear to be improper for the defendant to be allowed to amend now that the proof has been completed on the basis of the original admissions.

(4) An initial issue for decision by the Court in this case is whether a contractual obligation existed whereby Terminal Transport Company would be obligated to indemnify Georgia Kraft Company (and its liability insurance carrier) for losses sustained by the latter arising out of Georgia Kraft Company's own negligence or out of the joint negligence of the shipper and of the carrier. At the outset it should be again emphasized that this is not an action for contribution or indemnity between joint tort feasors and sounding in tort, but rather that it is an action for alleged breach of a contractual obligation for indemnity. It should likewise be borne in mind that indemnity is to be distinguished from

other rights having points of similarity, as for example an action for breach of contract due to failure of performance or as for example an action for contribution. Unlike an action for simple breach of contract due to failure to perform, where a party to a contract seeks to recover for the loss directly sustained by it due to the lack of performance and unlike an action for contribution, where some pro rata recovery is sought upon an apportionment of fault, in an action for indemnity the indemnitee seeks a full recovery from the indemnitor for the former's legal liability to a third party. 41 Am.Jur.2d, "Indemnity" § 1 et seq. The contractual obligation to indemnify in this case is said to arise out of the terms of the bill of lading and out of the relevant federal laws and regulations applicable to interstate motor carriers. More specifically, the relevant federal law is said to be that provision of the Interstate Commerce Act [49 U.S.C. § 20(11), as made applicable to motor carriers by 49 U.S.C. § 319] which requires every common carrier receiving property for interstate transportation to issue a bill of lading therefor, requires that the carrier be liable to the holder of the bill of lading for any loss caused by it, and forbids any contract exempting the carrier from such liability. The relevant federal regulation is said to be that provision of the motor carrier regulations requiring that the carrier, before moving a shipment, determine that the load is properly fastened and secured [49 C.F.R. § 192.9 (a) and (b)].

Collating these sources, the contractual indemnity obligation, if it exists, must accordingly arise out of the following relevant language from the bill of lading and the above cited federal law and regulation:

### Bill of Lading

"[R]eceive . . . the property described below in apparent good order . . . which said carrier . . . agrees to carry to its usual place of delivery at said destination . . .

subject to all the terms and conditions . . . in the applicable motor carrier classification or tariff . . ."

\* \* \* \* \* \*

### 49 U.S.C. § 20(11)

"Any common carrier . . . receiving property for transportation from a point in one state . . . to a point in another state . . . shall issue a receipt or bill of lading therefor, and shall be liable to the holder thereof for any loss, damage or injury to such property caused by it . . . and no contract, receipt, rule, regulation or other limitation of any character whatsoever shall exempt such common carrier . . . from the liability imposed . . ."

\* \* \* \* \* \*

### 49 C.F.R. § 192.9(a) and (b)

"(a) *Distribution and Securing of Load.*—No motor vehicle shall be driven nor shall any motor carrier permit or require any motor vehicle to be driven if it is so loaded, or if the load thereon is so improperly distributed or so inadequately secured, as to prevent its safe operation.

"(b) *Doors, Tarpaulins, Tailgates, and Other Equipment.* No motor vehicle shall be driven unless the tailgate, tailboard, tarpaulin, doors and all equipment and rigging used in the operation of said vehicle, and all means of fastening the load, are securely in place."

In construing the foregoing language to determine whether it imposes any obligation of indemnity upon the defendant, some issue appears to exist between the parties as to whether federal or state law must be looked to by the Court, and, if the latter, whether it should be the law of Tennessee or the law of Georgia. Since the resolution of the issue of contractual indemnity here involves the interpretation of a provision of a federal law and a provision of a federal regulation issued thereunder, it would appear clear to the Court that

federal law and not state law must govern the Court in its interpretation. See Crocker—Citizens National Bank v. United States, 320 F.Supp. 673 (D.C.E. D.Calif., 1970). A statement contrary to this appears to have been made in the cases of Brogdon v. Southern Railway Company, 384 F.2d 220 (6th Cir., 1967) and Eades v. Union Railway Company, 396 F.2d 798 (6th Cir. 1968), but upon closer examination it appears that the contract language there construed did not involve the interpretation of either a federal law or a federal regulation. No issue accordingly was there raised involving a choice of law.

■ Furthermore, the result would appear to be the same in this case irrespective of whether the Court looks to the federal law or to the law of either the State of Tennessee or the State of Georgia, as all three jurisdictions appear to be in harmony in this regard, that is, all three jurisdictions appear to have adopted the rule that clear and unambiguous language must exist in a contract before an obligation to indemnify a party against the consequence of its won negligence may be found. As stated in the case of United States v. Seckinger, 397 U.S. 203, 90 S.Ct. 880, 25 L.Ed.2d 224 (1970):

"More specifically, we agree with the Court of Appeals that a contractual provision should not be construed to permit an indemnitee to recover for his own negligence unless the court is firmly convinced that such an interpretation reflects the intention of the parties. This principle, though variously articulated, is accepted with virtual unanimity among American jurisdictions . . . In short, if the United States expects to shift the ultimate responsibility for its negligence to its various contractors, the mutual intention of the parties to this effect should appear with clarity on the face of the contract."

The law in both Georgia and Tennessee appears to be in accord. See Coweta County v. Central of Georgia Railway, 4 Ga.App. 94, 60 S.E. 1018; Kroger Co. v. Giem et al., 215 Tenn. 459, 387 S.W.2d 620 (1965); Union Carbide Corp. v. Dunn Bros., 294 F.Supp. 704 (D.C.M.D. Tenn., 1968); Brogdon v. Southern Railway Co., 384 F.2d 220 (6th Cir., 1967); Eades v. Union Railway Co., 396 F.2d 798 (6th Cir., 1968).

■ Applying the foregoing principle of contract interpretation to the language here relied upon by the plaintiffs as establishing their right to indemnity, the Court is of the opinion that no such indemnity obligation may be found in that language. Certainly it does not appear "with clarity from the face of the contract" even when that contract is read as including the relevant federal law and regulation.

The plaintiffs, in support of their contention however cite as controlling federal law the cases of United States v. Savage Truck Line, 209 F.2d 442, 44 A. L.R.2d 948 (4th Cir., 1953); General Electric Co. v. Moretz, 270 F.2d 780 (4th Cir., 1959); and Brogdon v. Southern Railway Co., 384 F.2d 220 (6th Cir., 1967).

Suffice to say that in the *Savage Truck Line* case the Court, mixing principles of tort and contract law, found the carrier to be the "principal offender" and to have "the last clear chance to avoid the catastrophe" and therefore to be liable to indemnify the shipper for its losses, even though the shipper was also negligent. In General Electric Co. v. Moretz, the same court, citing principles of admiralty law, arrived at the conclusion that since the motor carrier had the obligation under 49 C.F.R. § 192.9 (a) and (b) not to send a shipment on the road until it determined that the load was properly secured, its contract of carriage embraced the obligation to indemnify the shipper "in case it suffered loss occasioned by the negligence of the carrier."

The plaintiff contends that the rationale of contractual indemnity set forth in the *Moretz* case has been adopted in this Circuit in the case of Brogdon v. South-

ern Railway Co., *supra*. An examination of the *Brogdon* case, however, will reveal that the Court there adopted the rationale of the *Moretz* case only to the extent of approving the rule announced in that case that an express contract of indemnity would not be invalidated by any provision of the state workmen's compensation law. The matter is stated thusly in the *Brogdon* decision:

"We find no case decided by the Supreme Court of Tennessee which controls our decision. But in a well reasoned opinion the Fourth Circuit held that where the employer had expressly contracted to indemnify a third party, the exclusive remedy provision of Tennessee law did not serve to invalidate such a contract. We now accept and adopt the reasoning on this point of the Fourth Circuit in General Electric Co. v. Moretz, (citation omitted)."

Before determining the extent to which the rules established in the *Savage* and *Moretz* cases should be followed or applied to the facts and circumstances of the principal case, several matters should be noted in regard to these cases. In the first place, it should be noted that the *Savage* case states the general rule to be as follows:

"When the shipper assumes the responsibility of loading, the general rule is that he becomes liable for the defects which are latent and concealed and cannot be discovered by ordinary observation by the agents of the carrier; but if the improper loading is apparent, the carrier will be liable notwithstanding the negligence of the shipper."

It should next be noted that both the *Savage* and the *Moretz* cases lay emphasis upon the fact that the carrier in each of those cases knew of the defect in loading before undertaking the carriage. In the *Savage* case it is pointed out that "with equal certainty it was shown . . . that the driver concluded from his observation that the load was not properly fastened to the truck when he took charge of it." In *Moretz* the Court points out, "The uncontradicted evidence in the case shows that Mason & Dixon transported the goods with knowledge that they were insecurely loaded." Finally, it should be noted that both the *Savage* and the *Moretz* cases make no reference to, nor do they attempt to apply, the requirement that the language of the contract be "clear and unambiguous" before imposing upon the carrier the obligation to indemnify the shipper for loss occasioned by the shipper's own negligence. In addition to the discussion of this principle above, see Eades v. Union Railway Co., 396 F.2d 798 (6th Cir., 1968).

■■ Without attempting to further determine the soundness of the principles of indemnity law announced in the *Savage* and *Moretz* cases, about which this Court has reservations, under the facts of the principal case it is sufficient to recognize that the Court in the *Savage* case expressly approved, and the same Court in the *Moretz* case states nothing in disapproval, of the general rule that "when the shipper assumes the responsibility of loading, the carrier is not liable where the defects in loading are latent or concealed so that they cannot be discovered by ordinary inspection and observation." See annotation: 44 A.L.R.2d 993 at 1001; 14 Am.Jur.2d, "Carriers" § 531. It should be noted that the liability referred to here is liability for damage to the cargo, not liability to injured third parties. However, it would appear clear that if the carrier were not liable to the shipper for damage to the cargo because of the shipper's negligence, neither would it be liable to indemnify the shipper for the shipper's liability for negligent injury to a third party.

■ Accordingly, it would appear that even were the Court to follow the rule laid down in the *Savage* and the *Moretz* cases, no obligation on the part of the carrier to indemnify the shipper may be found under the facts of this case. Unlike the *Savage* and the *Moretz* cases, the evidence is clear that the de-

**1248**

fendant carrier in this case had no knowledge of the improper securing of the load by Georgia Kraft Company. The Court is of the opinion that the evidence fails to establish any breach on the part of Terminal Transport Company or its employees of the statutory obligation to ascertain the security of the load before undertaking to move it. In this regard it is clear from the evidence that Georgia Kraft Company, in using corrugated paper cleats to secure the load from lateral movement, rather than wooden cleats, was guilty of negligence and that this negligence proximately caused the accident and the injury to the drivers. This conclusion is further required upon principles of res judicata or judicial estoppel, Georgia Kraft Company having previously been so adjudicated negligent. It is likewise clear that unlike *Savage* and *Moretz* the carrier here had no actual knowledge of any improper loading of the rolls of paper by the Georgia Kraft Company employees. The Court is of the further opinion that the evidence does not support a finding that Terminal Transport Company breached its duty as a common carrier to inspect or to assure the security of the load before undertaking transit. The carrier's duty to inspect for the security of a cargo loaded by the shipper is not an absolute duty exonerating the shipper in every case from the shipper's own negligence in loading. Rather, the carrier has a duty to make a reasonable inspection and to observe and correct defects or insecurities in loading that are capable of being discovered in the course of a reasonable inspection. Before accepting the load the defendant's driver made an inspection to determine the security of the load. The load appeared to have been secured in a normal and usual manner previously found to be safe for transit. Although it appears that the defendant's driver made no observations as to whether the lateral cleats were in place, contending that they were not accessible to observation, the preponderance of the evidence indicates that the cleats were in fact in place. That un-

safe and improper material, that is, corrugated paper rather than wooden cleats, were used, and that such material would, under stress, pull loose from the nails holding it in place, were latent defects which the defendant's driver might not reasonably be expected to have observed or anticipated.

The defects in loading being latent, no breach of the duty on the part of the defendant occurred and no liability for indemnity would exist. The plaintiffs' lawsuit will accordingly be dismissed.