WHITEHALL PACKING COMPANY, INC., Respondent, v. SAFEWAY TRUCK LINES, INC., Appellant.

*No. 483. Argued April 8, 1975.—Decided May 6, 1975.*
(Also reported in 228 N. W. 2d 365.)

[22] (1968), 37 Wis. 2d 704, 712a, 155 N. W. 2d 545, 157 N. W. 2d 568.

[23] *See: Yanta v. Montgomery Ward & Co., Inc.* (1974), 66 Wis. 2d 53, 224 N. W. 2d 389.

For the appellant there were briefs by *Hale, Skemp, Hanson, Schnurrer & Skemp* of La Crosse, and oral argument by *William P. Skemp.*

For the respondent there was a brief by *Thomas M. Olson* and *Bosshard, Sundet, Nix & Talcott,* all of La Crosse, and oral argument by *Mr. Olson.*

CONNOR T. HANSEN, J. Whitehall is a beef slaughtering concern with its offices in Whitehall, Wisconsin. Whitehall engaged Safeway to transport a consignment of 40 barrels of fresh meat to Howard Johnson's in New York, with an additional consignment of 105 quarters of fresh carcass meat consigned to the Meilman Packing Company, also in New York.

The meat was loaded in the Safeway truck on July 17, 1969. The hanging meat was placed in the front of the truck, and the barreled meat was loaded in the rear. While the original bills of lading were not introduced at trial, two documents entitled "Memorandum" which referenced the bills of lading, were introduced and included notations that the meat was to be maintained at 32 degrees. Also appearing was a notation that the

property had been received by Safeway in apparent good order.

The Safeway truck left Whitehall in the afternoon of July 17, 1969. The normal running time to New York was thirty hours, not including rest stops. After delays at Tomah and Madison, Wisconsin, Chicago, Illinois, and Youngstown, Ohio, the truck arrived and finally delivery was attempted to Howard Johnson's at 9 a.m., Monday, July 21, 1969. At the time of attempted delivery, the United States Department of Agriculture representative broke the seal on the truck and on four barrels of the meat and announced that the meat had an off or gassy odor. The inspector would not permit the remainder of the barreled meat to be unloaded. The hanging meat was found to be in perfect condition and was subsequently delivered and accepted by the Meilman Packing Company.

The remaining 36 barrels of meat were ordered to be returned to Whitehall under instructions that the refrigeration in the truck was to be turned on in an attempt to freeze the meat and forestall further deterioration. Upon its return to Whitehall, an additional 2,775 pounds of meat was condemned by the receiving government inspector and the remaining meat was reworked and sold as animal food at a price of 12 cents per pound. Of the barrels returned, many contained six to eight inches of frozen meat on the top. However, even some of the frozen meat was in an off condition.

Eugene F. McDevitt, an ex-employee of Whitehall, who was in charge of quality control at Whitehall at the time of the transaction in question, testified as to the procedures in preparing the barreled meat for shipment.

McDevitt selected the cattle that were slaughtered for the shipment. The carcasses, after slaughter, were placed in a cooler at a temperature of 32 to 36 degrees

on July 15, 1969. On July 16, 1969, the carcasses were brought into the production or boning room where the bones were removed and the meat cut and placed in wooden or fiber barrels with plastic liners. The temperature in the boning room was maintained at approximately 36 to 38 degrees. As the carcasses entered the boning room, every fifth carcass was checked for temperature by inserting a thermometer into the thickest portion of the meat. This temperature had to be no higher than 36 to 38 degrees; however, McDevitt testified that as the meat for Howard Johnson's came from the front quarter of the carcass, the actual temperature of that meat would be slightly colder. As the meat was placed in the barrels it was inspected by the government inspector. The barrels were then placed in a finished product cooler in which a temperature of 32 degrees was maintained. On the day of shipment, July 17, 1969, the government inspector checked and sealed the barrels before they were placed in the truck.

McDevitt testified that the use of plastic liners in the barrels was required by the federal government. When questioned with regard to the possible use of dry ice in the barrels, McDevitt responded that Howard Johnson's required that no dry ice be used. He further testified that he packed Howard Johnson's orders for many years, both before and after the incident in question, and that despite using the same procedure on all occasions, this was the first load of meat that was returned.

Joseph Novak, Safeway's truck driver, whose deposition was introduced at the trial in lieu of calling him to testify, stated that the refrigeration unit in the truck was operating properly during the entire trip. He admitted, however, that it was necessary to cycle the unit to defrost about every four hours to prevent the unit from icing up. Novak also indicated that the front of

the truck could be as much as six to eight degrees colder than the rear of the truck due to the location of the refrigeration unit.

Joseph C. Sullivan, a private meat inspector hired by Safeway to inspect the meat upon arrival in New York, stated in his deposition that the barreled meat was smothered. Sullivan attributed this condition to the use of the plastic liners in the barrels and the absence of tubing and dry ice to chill the center of the barrels where the air from the truck refrigerator would not penetrate. Sullivan additionally stated that the temperature of the hanging meat in the truck, shortly after its arrival in New York, was 44 to 46 degrees.

The trial court found no negligence on the part of Whitehall in cooling the meat prior to shipping. It additionally found that the meat was packed by Whitehall in accordance with the federal requirements for lining the barrel and with the approval of the federal meat inspector. The trial court further found that the difference in temperature between the front and rear of Safeway's truck accounted for the difference in the arrival condition of the hanging meat and the barreled meat. The trial court then held Safeway liable to Whitehall under the rule holding a common carrier liable for loss as an insurer. In the alternative, the trial court held, that while Whitehall had not proven Safeway guilty of any specific acts of negligence, there was a strong inference, perhaps equivalent to *res ipsa loquitur,* that some negligence on the part of Safeway caused the damage to the meat. The trial court awarded damages to Whitehall for the damaged meat but permitted Safeway an offset for the freight charges in delivering the good meat to the Meilman Packing Company.

We view the following issues to be dispositive of this appeal:

1. Did the trial court err in concluding that Safeway was liable as a common carrier under the common-law rule?

2. Did the trial court err in permitting Safeway to recover only a portion of the freight charges under its counterclaim?

*Common-law liability.*

At common law, a common carrier is deemed an insurer against loss of, or damage to, property received by it for transportation. *Mastercraft Paper v. Consolidated Freightways* (1972), 55 Wis. 2d 674, 681, 200 N. W. 2d 596; *Allis-Chalmers Mfg. Co. v. Eagle Motor Lines* (1972), 55 Wis. 2d 39, 45, 198 N. W. 2d 162; 14 Am. Jur. 2d, *Carriers*, p. 39, sec. 508. Proof of delivery to the carrier in good condition and arrival at destination in a damaged condition, makes a prima facie case against the carrier. *Mastercraft Paper v. Consolidated Freightways, supra; Allis-Chalmers Mfg. Co. v. Eagle Motor Lines, supra; L. L. Richards Machinery Co. v. McNamara Motor Express, Inc.* (1959), 7 Wis. 2d 613, 97 N. W. 2d 396.

The common-law duty of the carrier is absolute unless there is proof that the damage in question comes within one of the exceptions to the rule. Thus, it is recognized that the carrier is not liable for damage occurring because of an act of God, a public enemy, the shipper, or because of the instincts, habits, propensities, vices, or inherent nature of the goods. *Laridaen v. Railway Express Agency, Inc.* (1951), 259 Wis. 178, 181, 47 N. W. 2d 727; *Joseph Miller Co. v. Gateway City Transfer Co.* (1945), 247 Wis. 584, 20 N. W. 2d 651; *Southern Pac. Co. v. Itule* (1937), 51 Ariz. 25, 74 Pac. 2d 38. Once the shipper has established its prima facie case by proof of delivery to the carrier in good condition, but

delivery by the carrier in bad condition, the burden is upon the carrier to show its freedom from negligence and that the damage in question falls within one of the enumerated exceptions. *Missouri P. R. Co. v. Elmore & Stahl* (1964), 377 U. S. 134, 84 Sup. Ct. 1142, 12 L. Ed. 2d 194; [1] *Laridaen v. Railway Express Agency, Inc., supra,* page 181.

Safeway argues that fresh meat is a perishable commodity and that the spoilage in this case, therefore, falls within the perishable goods exception to the common-law rule of carrier liability.

In so contending, we are of the opinion that Safeway misapprehends the nature of its burden in escaping liability. While it is true that meat has a propensity to spoil if left unattended, it is incumbent upon the carrier to show, not the general tendency of the commodity in question to spoil, but that the damage in the instant case was due solely to that propensity. *Missouri P. R. Co. v. Elmore & Stahl, supra,* pages 136, 137; *Laridaen v. Railway Express Agency, Inc., supra,* page 181; 13 C. J. S., *Carriers,* pp. 153, 154, sec. 79a.

In *Missouri P. R. Co. v. Elmore & Stahl, supra,* the issue was whether the carrier was liable for spoiled melons where the findings of the jury were that the melons were delivered to the carrier in good condition but delivered by the carrier in spoiled condition; that the carrier performed all of the required services without negligence; but that the damage in question was not

---

[1] The *Missouri Case* sets forth the liability of a carrier under the Carmack Amendment of 1906, sec. 20 (11) of the Interstate Commerce Act applicable to motor carriers by virtue of sec. 319 of that act. *See:* 49 USCA, secs. 20 (11) and 319. The parties do not argue whether those sections govern the present case and we find it unnecessary to reach the question for the reason that the federal law codifies the common law and applies the same interpretation of that law which we have set forth in the *Laridaen Case* and here affirm.

due solely to an inherent vice in the melons. The supreme court held that the carrier was liable because it had not proven that the damage in question was due solely to the inherent vice of the goods and had thus failed to bring the case within the exception to rebut the prima facie case of the shipper.

We are of the opinion that Safeway has similarly failed to bring the present case within the perishable goods exception, and has not, therefore, exempted itself from the prima facie case made out by the shipper's proof.

The trial court found that there was no specific proof that Safeway was negligent in its duties with regard to shipping the goods in question. Thus, Safeway has succeeded in meeting the first requirement to avoid liability. The trial court also found, however, that fresh meat, under proper refrigeration, should last for at least six days. The trip in question took only four days. As this finding is not against the great weight and clear preponderance of the evidence, it can be concluded that the damage in the present case was not shown to be solely the result of the inherent propensity of the meat to spoil, but was the result of some action or inaction on the part of the shipper or the carrier. The perishable goods exception is, therefore, unavailable to the carrier. *Missouri P. R. Co. v. Elmore & Stahl, supra; Laridaen v. Railway Express Agency, Inc., supra.*

The case of *Joseph Miller Co. v. Gateway City Transfer Co., supra,* relied upon by Safeway, does not require a different conclusion. In that case the commodity being shipped was bottled brandy. On a hot day, some of the wax seals on the bottles softened and the corks popped, causing spillage of the contents. This court noted that there were two possible causes of the loss. One was a build-up in pressure in the bottles due to natural fermentation, and the other was an expansion of the brandy

due to heat. Without reaching the question of whether the proof of the carrier established which of the two possible causes was the actual cause, this court held that the carrier could not be liable in either event. Crucial to that determination was the holding of this court that the carrier was under no duty to provide cooling for the bottles.

In the present case, it was incumbent upon the carrier to provide refrigeration for the meat. The bill of lading required that the meat be maintained at a temperature of 32 degrees. Moreover, it is generally held that when the nature of the commodity requires refrigeration, the duty to provide proper refrigeration rests upon the carrier regardless of whether the bill of lading so provides. 13 C. J. S., *Carriers*, p. 105, sec. 61.

Safeway also contends that the evidence led to the inescapable conclusion that the damage to the meat in question was the fault of the allegedly improper packing and cooling by Whitehall. The attempt is thus made to fit this case within the acts-of-the-shipper exception to the common-law rule.

Safeway relies heavily upon the testimony of Novak that the refrigeration unit in the truck worked properly throughout the trip, and the testimony of Sullivan that the barreled meat was improperly packed. Also relied upon is the fact that the hanging meat arrived in perfect condition despite the spoilage of the barreled meat.

The trial court determined that Whitehall was not negligent with regard to the packing or cooling of the meat before shipment. Reliance was placed on the extensive testimony of McDevitt concerning the procedures utilized in packing the meat and the frequency of inspections during the process by the department of agriculture examiners. The trial court also noted that the use of plastic liners in the barrels, thought by Sullivan to be a substantial factor in the spoilage of the meat,

was required by federal regulations. In addition, the trial court relied on the fact that the temperature in the front of Safeway's truck, where the hanging meat was stored, was substantially lower than that in the rear where the barreled meat was stored.

A complete review of the record leads us to the conclusion that the findings of the trial court in this regard were not against the great weight and clear preponderance of the evidence. Thus, we are of the opinion that Safeway has failed to prove that this case falls within the act-of-the-shipper exception or any other exception to the common-law rule of liability.

The general rule of carrier liability is based upon the premise that the carrier has peculiarly within its knowledge all the facts upon which it may rely to relieve it of liability. While the carrier has sole possession of the goods, it is the only one in a position to acquire the knowledge of what actually damaged the shipment. Thus the law places upon the carrier the burden of a loss which it cannot explain and bring within one of the exceptions which relieve it from liability.

Safeway further contends that it cannot be found liable because Whitehall neither pleaded nor proved that Safeway was guilty of specific acts of negligence. The common-law rule does not require that specific acts of negligence be pleaded or proven. The shipper, as stated above, established a prima facie case for liability without proof of such acts by the carrier. Moreover, it is generally recognized that the shipper cannot avail itself of the common-law rule if it pleads specific acts of negligence. 14 Am. Jur. 2d, *Carriers*, p. 135, sec. 621; *cf. Mastercraft Paper v. Consolidated Freightways, supra,* page 683.

Because of our determination that the trial court correctly found Safeway liable under the common-law rule governing liability of common carriers, we deem

it unnecessary to discuss whether the doctrine of inferences or *res ipsa loquitur* might also apply. We have considered the other issues raised by Safeway but find them to be without merit.

*Counterclaim.*

Safeway counterclaimed for the full amount of transportation charges both to and from New York. The trial court permitted an offset in an amount, later stipulated to by the parties, representing the cost of transporting the unspoiled carcass meat to the Meilman Packing Company.

Safeway cites no authority for its position and we view its contention as contingent on a favorable disposition of its other contentions which would have the effect of placing the responsibility for the damage on Whitehall. As we have concluded that the trial court correctly found Safeway liable for the damage, further recovery by Safeway on its counterclaim is unwarranted. The judgment of the trial court establishes that Safeway breached its contract of carriage as to the meat that was damaged and may not have the benefit of the bilateral agreement.

Safeway also claims that it is entitled to the full measure of relief demanded by the counterclaim because Whitehall failed to reply thereto.

This court has held that a party cannot raise the failure to reply to a counterclaim for the first time on appeal where no objection was raised in the trial court and where the parties proceeded to try the issue on the merits on the assumption that the allegations of the counterclaim were in dispute. *Kaiser v. Better Farms, Inc.* (1946), 249 Wis. 302, 24 N. W. 2d 621; *Killman v. Gregory* (1895), 91 Wis. 478, 65 N. W. 53. Moreover, a reply is not mandatory, sec. 263.20, Stats., and the failure to reply does not waive the sufficiency of the

evidence to establish a defense, sec. 263.19. While the party counterclaiming may move for judgment on the counterclaim where there has been no reply, sec. 263.21, the failure to do so in the trial court, while proceeding on the merits, waives the right to recover by default of reply. *Kaiser v. Better Farms, Inc., supra.*

*By the Court.*—Judgment affirmed.