Bill SYMINGTON, d/b/a Bill's Truck
Stop, Plaintiff,

v.

GREAT WESTERN TRUCKING
COMPANY, INC., et al.,
Defendants.

Civ. No. 85–127–E.

United States District Court,
S.D. Iowa, C.D.

March 17, 1987.

Donald Anderson, St. Louis, Mo., for plaintiff.

Dennis Jerde, Des Moines, Iowa, Frederick Dovell, Middlebury, Conn., Harry Perkins, III, Des Moines, Iowa, for defendants.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND JUDGMENT

DONALD E. O'BRIEN, Chief Judge.

This matter came on for trial to the Court on November 3 and 4, 1986. After careful consideration of the evidence, the parties' posttrial briefs, and their proposed findings of fact and conclusions of law, the Court finds both Uniroyal and Great Western equally at fault and concludes that they should equally share the amounts paid in settlement.

## FINDINGS OF FACT

On October 4, 1984, workers at the Uniroyal plant in Naugatuck, Connecticut loaded 24 barrels of Tonox 60/40 onto a truck owned and operated by Great Western Trucking Company, Inc. Uniroyal has manufactured this product for twenty years. (Exhibit D, p. 7). Tonox 60/40 is an industrial chemical which acts as a hardening agent when mixed with other chemicals. (Deposition of Edward Sowlinski at p. 9). It is a blend of 60% methylenedianiline and 40% metaphenylenediamine. (Sowlinski Deposition at 10). The Tonox 60/40 was bound for a Hercules plant in Clearfield, Utah. The 24 barrels were loaded into the "nose" of the Great Western trailer, with the last two rows placed on corrugated fiberboard. (Deposition of Joseph Wojtczak at 44). The Great Western driver, Marion Beauchamp, received a copy of a bill of lading (Exhibit A). While the bill of lading did show that the Tonox 60/40 was poisonous, Beauchamp received no instructions either orally or in writing as to any specific damage that could occur in the event of a leak. While safety data sheets containing more complete information as to the product's handling and hazards (Exhibit E, p. 13) are provided to customers, they are not provided to drivers or carriers.

Beauchamp left the Uniroyal plant at Naugatuck and proceeded to Uniroyal's plant in Painesville, Ohio to pick up 30,000 pounds of crude rubber before continuing to Utah. When Beauchamp arrived at the Painesville plant, the 24 drums of Tonox 60/40 were removed from the nose of the truck and the crude rubber was placed in the trailer's front end. The drums were then placed on pallets and loaded into the truck's rear. This was done because the rubber was to be delivered after the Tonox 60/40. Each pallet held four drums. However, the pallets were not large enough to fully accommodate four drums, resulting in overhang. No blocking or dunnage[1] was placed between the back door and the end of the load. Nor were the last two rows wrapped or banded. However, Jack Crislip, material handing supervisor at the Painesville plant, testified that the plant now does wrap or band loads.

Painesville loading procedure required that the driver inspect the load prior to closing the trailer's doors and for the driver to place a seal on the doors after they had been closed. As the truck was backed up flush with the loading dock, Beauchamp would have had to drive up the ramp and

---

1. Dunnage: loose materials used around a cargo to prevent damage, or padding in a shipping container to protect contents against breakage. *Webster's New Collegiate Dictionary* 350 (1973).

stop in order to close the doors. There is no evidence that this practice was not followed, and the Court concludes that the reasonable inference is that Beauchamp had the opportunity to observe the manner in which the barrels were loaded.

Jack Crislip signed the bill of lading for the crude rubber shipment which had been consolidated with the Naugatuck shipment of Tonox 60/40. (Exhibit B). The bottom left corner of the bill of lading, directly above Crislip's signature, states as follows:

[t]his is to certify that the above named products are properly named, classified, described, packaged, marked and labeled and are in proper condition for transportation according to applicable regulations of the Department of Transportation.

Beauchamp proceeded from Painesville, Ohio enroute to Clearfield, Utah. On October 6, 1984, approximately 2.5 miles east of Stuart, Iowa, Beauchamp stopped his truck on Interstate 80 and discovered that the Tonox 60/40 was leaking from the rear end of the trailer. Rather than remaining on the interstate's shoulder, Beauchamp drove the leaking truck to Bill Symington's Truck Stop, off Exit 93. Symington directed Beauchamp to pull around to the back parking lot, which Beauchamp did not immediately do. A nervous Beauchamp showed Symington the bill of lading, which merely said that the Tonox 60/40 was poisonous and gave an 800 number to call in the event of a spill. Symington testified that the driver had no safety handling sheets regarding the chemical and was not really aware of the nature of the chemical in his truck. Symington observed no physical damage to the vehicle and testified Beauchamp had said he had not had any problems along the way.

Beauchamp then called the fire department. Symington had a clear view of the rear of the trailer when the firemen opened the doors. He testified that there was a space between the end of the pallets and the back door and that two barrels were tipped off the pallets in such a way that they would have fallen out had the firemen opened both doors simultaneously. Symington observed that one drum was empty and that its bottom chime [2] was split. (Exhibit E, p. 33). Another drum had one or two gashes in its side wall.

In addition to the fire department, Beauchamp also contacted his employer, Great Western. Larry Norwood of Great Western then contacted B.J. Frennesson at Uniroyal to determine what the product's potential danger was. Frennesson informed Norwood that he had no authority to make any commitment on behalf of Uniroyal to clean up the spill and was concerned that he might lose his job if he did so. Frennesson did, however, provide Norwood with the names of three companies who specialized in cleaning up chemical spills. Great Western contacted Ryckman's Emergency Action and Consulting Team, D.W. Ryckman and Associates (REACT). REACT personnel then took charge of containment and the cleanup operation in coordination with the Iowa Department of Environmental Quality.

Uniroyal sent Henry De Vries to Stuart, Iowa. De Vries was Uniroyal's hazardous materials supervisor. When he arrived, REACT personnel had already begun the cleanup operation. While De Vries informed Bill Symington that he lacked authority to obligate Uniroyal in any manner for the spill, De Vries did discuss Tonox 60/40 properties with the volunteer firemen who had initially responded to the spill. De Vries provided safety data sheets on Tonox 60/40 to REACT personnel. (Exhibit E, pp. 13–14). This sheet contains information about the chemical's properties, health data, storage, spills, and disposal information. Uniroyal also provided a medical statement to the Stuart, Iowa Fire Department. (Exhibit D, p. 7). The statement noted that methylenedianiline, one of the ingredients in Tonox 60/40, may cause toxic hepatitis through over exposure. The report also stated that firemen were given precautionary physicals and no liver abnormalities were noted. Allan Goldberg, a state Environmental Specialist, reported that while firefighters wore protective

---

**2.** Chime: the edge of a rim or cask. *Webster's New Collegiate Dictionary* 191 (1973).

gloves, eleven later discovered their hands and feet were discolored with a yellow stain. (Exhibit D, p. 10). Goldberg also reported that some of the Tonox 60/40 had migrated from underneath the plastic sheets placed over the spill, and the material appeared to be leaching into the soil. (Exhibit D, p. 12). REACT's report noted that the material which had spilled onto Interstate 80 had migrated off the asphalt shoulder onto the adjacent soil. (Exhibit E, p. 5).

Testing and cleanup operations continued past October 24, 1984. Soil samples analyzed by Uniroyal, University Hygienic Laboratory and REACT all produced different results. (Exhibit D, p. 12). Edward Sowlinski, Uniroyal's Manager of Toxicology, indicated that Uniroyal was willing to certify that the Tonox 60/40 would degrade in place through biological activity within a one-year period. (Exhibit E, p. 4). REACT disagreed with this conclusion, but state environmental officials decided to accept Uniroyal's certification contingent on independent monitoring of the degradation for one year. (Exhibit E, pp. 4–5).

Bill Symington testified that he had spoken to Art Carls at Great Western several times and was informed that something would be done. However, he stated that Uniroyal never offered to help. Symington was unable to get a clean bill of health for his truck stop for some time, and he had to close for a while because he had to repair the parking lot. As a result, Symington sued Uniroyal and Great Western for property damage allegedly sustained as a result of the spill. REACT sued Great Western for amounts allegedly due for the cleanup operation. Great Western filed a third-party complaint against Uniroyal for indemnity and contribution in the REACT litigation. Great Western also filed a cross-claim against Uniroyal for indemnity with respect to claims made by Bill Symington. The Symington and REACT cases were then consolidated. Before trial, Great Western and Uniroyal settled with Symington and REACT. The parties agreed that Bill Symington would receive $17,500.00, and REACT would receive $70,000.00. Great Western and Uniroyal each contrib-uted one-half towards this settlement package and agreed to proceed to trial to determine who would be responsible for indemnity and/or contribution.

## CONCLUSIONS OF LAW

■ The common law applicable to common carriers holds that a common carrier is deemed an insurer against loss of or damage to property received by it for transportation. *R.H. Fulton v. Chicago, Rock Island and Pacific R.R.*, 481 F.2d 326, 333 (8th Cir.), *cert. denied*, 414 U.S. 1040, 94 S.Ct. 540, 38 L.Ed.2d 330 (1973); *United States v. Savage Truck Lines*, 209 F.2d 442, 445 (4th Cir.1953); *Whitehall Packing Co. v. Safeway Truck Lines, Inc.*, 68 Wis.2d 369, 228 N.W.2d 365, 368 (1975); *J.H. Cownie Gloves Co. v. Merchants' Dispatch Transp. Co.*, 130 Iowa 327, 106 N.W. 749, 750 (1906). There are five common law exceptions to the carrier's liability for damages caused by: (1) an act of God; (2) the public enemy; (3) the acts of the shipper himself; (4) public authority, and (5) the inherent vice or nature of the goods. *World-Wide Meats, Inc. v. Chicago & N.W. Transp. Co.*, 383 F.Supp. 807, 809 n. 1 (N.D.Iowa 1974); *Whitehall Packing Co.*, supra, 228 N.W.2d at 368; *J.H. Cownie*, supra, 106 N.W. at 750.

■ However, the instant case is not the ordinary "shipper-claim case", as Uniroyal is not suing Great Western for damage to the shipment. Rather, this is a "carrier-claim" case, where the carrier makes a claim for compensation, indemnification or contribution from the shipper. At least one court has held that the common law carrier rule does not apply in this situation. *Southern Pacific Transp. Co. v. United States*, 456 F.Supp. 931, 939 (E.D.Cal.1978). In *Southern Pacific*, the court reasoned that many justifications for imposing the common law burden on the carrier simply do not exist when the case involves carrier versus shipper for carrier damages rather than shipper versus carrier for shipper damages. *Id.* The court stated:

[f]irst, the presumption of carrier negligence that arises in a shipper-claim situa-

tion when a shipper shows delivery of the goods in good condition and their arrival in damaged condition, does not apply to the situation in which the *carrier's* property is involved. Second, the carrier's "bailee duty" to the cargo does not exist when the focus is on the carrier's own property. Third, the quasi-fiduciary responsibility that a carrier has to a shipper with regard to shipped goods does not exist as to the carrier's own property. Nor is the carrier an "insurer" of its own property as it is for the shipper's property. Finally, the possibility of collusion between carriers and thieves to steal the cargo, which justifies imposing the burden of proof on the carrier in the shipper-claim situation, is not present in the carrier-claim situation.

*Id.* (emphasis in original).

At first glance, *Southern Pacific* is not completely analogous to the case at bar, as Great Western seeks only contribution and/or indemnity, not damages to its own property. Yet, close examination of the facts in *Southern Pacific* reveals that it is analogous. In that case, Southern Pacific contracted with the Navy to transport eighteen bomb-laden boxcars from Nevada to California. *Id.* at 932. The boxcars exploded in Southern Pacific's yard in Roseville, California enroute to Port Chicago, California. *Id.* Southern Pacific's sued the United States for damages to its trainyard and also sought indemnification and contribution for third-party claims. *Id.* at 933. Thus, this Court finds that as the factual scenario is analogous, it is appropriate to apply the analysis of the *Southern Pacific* case, and is persuaded by that court's reasoning that the common-law-carrier-as-insurer rule does not apply. Therefore, this Court will apply common law principles of indemnity and contribution and statutory principles of comparative fault in determining ultimate liability for the settlement payments.[3]

■ The Court finds that the evidence supports the conclusion that both Great Western and Uniroyal should each bear one-half of the amounts paid in settlement. Uniroyal argues that the Great Western driver had the opportunity to inspect the manner in which the truck was loaded and that, therefore, it was his negligence in failing to observe any defect in the load which was the proximate cause of the damages incurred from the spill.

■ However, the evidence is undisputed that Uniroyal employees reloaded the drums containing Tonox 60/40 at the Painesville, Ohio plant. While responsibility for obviously improper loading rests on the carrier, the shipper is liable for loading defects which are latent and concealed. *Franklin Stainless Corp. v. Marlo Transport Co.*, 748 F.2d 865, 868 (4th Cir.1984); *United States v. Savage Truck Line, Inc.*, 209 F.2d 442, 445 (4th Cir.1953); *Georgia Kraft Co. v. Terminal Transport Co.*, 343 F.Supp. 1240, 1247 (E.D.Tenn.1972). Jack Crislip, the material handling supervisor at Uniroyal's Painesville, Ohio plant, testified that he signed Exhibits A and B. Exhibit A was the bill of lading for the Tonox 60/40, and Exhibit B was the shipping order for the rubber. As noted in the Findings of Fact, both these exhibits indicated that Crislip's signature certified that the materials were packaged, marked, labeled and were in proper condition for transportation. Crislip also testified that the driver usually also signs this form.

Exhibit H is a photograph of the inside of the truck after the spill. Crislip stated that the manner in which the pallets were situated in that picture struck him as "not being quite right." Apparently, when the palletized drums were loaded at Painesville, the pallets were touching at the center of the truck. However, in Exhibit H, Crislip noted that the pallets were flush with the sides of the truck, instead of the drums being centered on the pallets as they apparently were at the time of loading. He stated that the pallets would have been in

---

**3.** The Court notes that Great Western and Uniroyal have stipulated that as this action was filed after July 1, 1984, the Iowa Comparative Fault Act, Iowa Code, Chapter 688, applies.

Thus, the apportionment of fault between the parties under principles of comparative fault will control as to the division of ultimate responsibility for amounts paid in settlement.

better position if they had been closer together at the center. Crislip further testified that he had never had any problems shipping drums on pallets, and that he had no idea as to why the barrels slipped off the pallets. Crislip stated that he considered it the driver's responsibility to notify the loaders if he believed the loading was improper, but revealed that his loaders had never been challenged at Painesville. Crislip also stated that the driver "probably had a right to rely on the way we package and load the truck."

The Court also notes that two Uniroyal managers disagreed as to the proper loading method. Joseph Wojtczak's testimony was introduced by way of deposition. At the time of this incident, he was manager of shipping and warehousing at the Uniroyal plant in Naugatuck, Connecticut. He stated that his practice was to load barrels on the floor rather than pallets to prevent the drums from shifting or falling off the pallets. (Wojtczak Deposition at p. 42). He further testified that if a truck was loaded partially with box-stored rubber and partially with Tonox 60/40 barrels on pallets with space left at the end of the truck, he would wrap the last two pallets, presumably to prevent load shifting. (Wojtczak Deposition at p. 32). However, Jack Crislip testified that "banding" or wrapping would not have helped and also stated that no "blocking" or "dunnage" was placed between the truck's back door and the end of the load.

The Court finds that the above discussion of the evidence demonstrates that the barrels were defectively loaded, and the defect was not as open and obvious as Uniroyal might contend. When the Great Western driver received the shipping order and bill of lading, it is reasonable to infer that he believed that the truck was properly loaded, especially in light of the language certifying that the materials were in "proper condition for transportation." Also, Jack Crislip's belief that the pallets were not quite right as pictured in Exhibit H indicates that when the pallets were loaded, they were placed so that they met in the center of the truck. As the loaders were not responsible for closing the truck's doors, the driver would have had to examine the load before leaving. If the pallets were flush at the center, then barrel overhang would have been at the sides of the pallets, thus forcing them to rest against the side of the truck. Thus, the driver would not have observed the barrels hanging over at the end of the load. Crislip himself stated that the better position would have been for the pallets to be touching in the center. In addition, while Crislip and Wojtzcak disagreed as to the correct manner of loading, Crislip's testimony indicates that his manner was correct. Thus, the inference may reasonably be drawn that he did not consider the defect as open and obvious. This conclusion is underscored by his testimony that the driver should have been able to rely on the manner in which the truck was loaded.

■ Great Western also argues that the damage to the barrels carrying the Tonox 60/40 was caused by a stress-related failure which allowed them to leak, relying on Exhibit F. Exhibit F is a Uniroyal internal memo changing the barrels in which Tonox 60/40 was to be packaged. The memo states:

[t]his change has been approved by Marketing in response to the recent Tonox 60/40 spill in Stuart, Iowa. The 18 GA. top and bottom of this drum should limit the potential for stress related failure which caused the Iowa leakage.

The Tonox 60/40 had previously been packaged in drums with a 16 GA. top and bottom. The 18 GA. was a heavier grade.

Uniroyal objected, arguing that this was an inadmissible subsequent remedial measure. Under Fed.R.Evid. 407, subsequent remedial measures are not admissible to prove negligence or culpable conduct. However, such measures are admissible to prove ownership, control, feasibility of precautionary measures, if controverted, or impeachment. Fed.R.Evid. 407. The Court finds that Exhibit F is admissible for impeachment purposes. The gist of Uniroyal's argument and evidence at trial was

that it had never had a problem like this before, and had done everything it could to secure the load. Exhibit F is therefore admissible to refute this argument. *Anderson v. Malloy,* 700 F.2d 1208, 1214 (8th Cir.1983); *Kenny v. Southeastern Pennsylvania Transp. Auth.,* 581 F.2d 351, 356 (3d Cir.1978), *cert. denied,* 439 U.S. 1073, 99 S.Ct. 845, 59 L.Ed.2d 39 (1979). However, the Court did not place any great weight on Exhibit F in reaching its decision. There was no evidence that a drum with an 18 GA. top and bottom would have held where the 16 GA. did not. Henry De Vries testified that this memo was written *before* the damaged barrels were returned to Uniroyal for inspection. He further stated that subsequent investigation revealed that the damage was not due to a metallurgy problem in the barrels' composition. Uniroyal also objected to pages 5–6 and 26–27 of Exhibit E. Exhibit E is a report prepared by REACT after the cleanup operation. On pages 5 and 6, REACT concluded that the leak was caused by load shifting because the barrels were loaded on undersized pallets. Pages 26 and 27 consist of a mailgram from REACT to Great Western, advising Great Western not to accept Uniroyal's certification regarding decomposition of the remaining residue unless Uniroyal guaranteed in writing that it would accept all responsibility for any damage associated with leaving the residue at the truck stop and on Interstate 80. Uniroyal objected, arguing that these constituted opinions lacking proper foundation. The Court finds that both pages 5–6 and 26–27 of Exhibit E are admissible. REACT was reporting what it had observed at the spill site, and was therefore qualified to render an opinion. However, the Court did not place any great reliance on these pages in reaching its decision, as there was competent evidence from other sources regarding the size of the pallets, and Uniroyal's own report (Exhibit D) contains a report from a state Environmental Specialist which reveals that REACT recommended that officials should not accept Uniroyal's certification.

Even if the loading defect was not open and obvious, Uniroyal was negligent in failing to properly warn the Great Western driver of the harmful propensities of Tonox 60/40 and of any reasonably foreseeable danger from transporting it. *Lakatosh v. Diamond Alkali Co.,* 208 N.W.2d 910, 914 (Iowa 1973). In *Lakatosh,* the Iowa Supreme Court faced a situation similar to this case. The plaintiff owned a 35–foot trailer which he used to transport meat from Dubuque to New York City. *Id.* at 912. Once he delivered the meat, he would obtain whatever cargo he could for the return trip. *Id.* Plaintiff picked up a shipment of weed killer at Diamond Alkali. Unfortunately, the weed killer's odor contaminated his trailer so that it was no longer able to haul meat, compelling plaintiff to dispose of it. *Id.* The court held that while the plaintiff may have been warned by the warnings on the bags of injury to his person, there was no evidence that warned him of the possible damage to his trailer. *Id.* at 914.

In the instant case, while the bill of lading indicated that the Tonox 60/40 was poisonous, it did not carry any other warning as to the possible damage to the environment or the truck. This is especially important in light of Joseph Wojtczak's deposition testimony that a truck had to be buried out in California after a spill incident involving Tonox 60/40. (Wojtczak's Deposition at p. 33). The evidence was clear that this incident was prior to the spill in Iowa and that Uniroyal was aware of this prior spill. Had the driver been provided with a copy of the safety data sheet, he might have exercised more caution in observing the loading process to make sure that the barrels were properly secured.

The foregoing discussion does not, however, require Uniroyal to totally indemnify Great Western. Indemnity is the extreme form of contribution, justified when the differences in the parties' degree of fault is so great as to throw the whole loss upon one. *United States v. Savage Truck Line, Inc.,* 209 F.2d 442, 447 (4th Cir.1953). The Court finds that the Great Western driver

should have remained on the shoulder of Interstate 80 after discovering the leak, instead of proceeding to Bill's Truck Stop. Also, he failed to immediately pull his rig to the back of the parking lot as requested by Bill Symington, thus causing further damage.[4] But for these actions, the damages occasioned by shutting down a commercial business would not have been incurred. Also, the Court believes that the cleanup costs would have been less had Beauchamp remained on the highway. Great Western had no policy for its drivers to follow in a spill situation, and Larry Norwood of Great Western testified that the company had no such training program for its drivers. The Court concludes that the difference in fault does not justify imposing all liability for the accident on Uniroyal. Rather, both Uniroyal and Great Western should share this burden, and should equally divide the settlement payments to Symington and REACT. *See Franklin Stainless Corp. v. Marlo Transport Corp.*, 748 F.2d 865, 870–71 (4th Cir. 1984).

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that both Great Western and Uniroyal were equally at fault in this matter.

IT IS FURTHER ORDERED that both Great Western and Uniroyal shall equally share the settlement payments made to Symington and REACT.

---

4. Unfortunately, neither Great Western nor Uniroyal called the driver as a witness, claiming he was "unavailable". The Court finds this surprising, especially on Great Western's part. Nor did Great Western seek to introduce the driver's report. The Court finds it difficult to believe that Great Western did not require its drivers to file a report on an incident such as this, especially as the driver continued to work for Great Western for some time after this incident.