FILED

Apr 12 2019, 9:27 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



ATTORNEYS FOR APPELLANT

Caroline B. Briggs
Lafayette, Indiana

W. Winston Briggs
Atlanta, Georgia

Terry D. Jackson
Atlanta, Georgia

ATTORNEY FOR APPELLEES

Kevin C. Tyra
THE TYRA LAW FIRM
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Paul Michael Wilkes,

*Appellant-Plaintiff,*

v.

Celadon Group, Inc., et al.,

*Appellees-Defendants.*

April 12, 2019

Court of Appeals Case No.
18A-CT-2011

Appeal from the Marion Superior
Court

The Honorable David J. Dreyer,
Judge

Trial Court Cause No.
49D10-1601-CT-3170

**Bailey, Judge.**

# Case Summary

Paul Michael Wilkes ("Wilkes") appeals the grant of summary judgment in favor of Celadon Trucking Services, Inc., Celadon Logistics Services, Inc. and Celadon Group, Inc. (collectively, "Celadon") and Cummins, Inc., Cummins Corporation, and Cummins John Doe Entities (collectively, "Cummins") (at times, collectively referred to as "Defendants" or "Appellees"), upon Wilkes's negligence claims.[1] We affirm in part, reverse in part, and remand for further proceedings.

# Issues

Wilkes presents two consolidated issues for review:[2]

I.   Whether the trial court erroneously granted summary judgment to Celadon upon determining that Celadon owed Wilkes no duty of care; and

II.  Whether the trial court erroneously granted summary judgment to Cummins upon determining that Cummins owed Wilkes no duty of care.

---

[1] He does not challenge the grant of summary judgment upon his negligent hiring claims.

[2] Appellees have submitted a joint brief with joint arguments on absence of duty. For the most part, we address the arguments as one; however, we will separately address some contentions or designated facts as applicable to one appellee but not another.

# Facts and Procedural History

[3] Cummins is a manufacturer of engine parts, with a principal place of business in Columbus, Indiana. Cummins contracted with Celadon Dedicated Services to transport, by semi-truck and trailer, empty reusable containers in which Cummins housed engine parts ("returnables"). Cummins would stack the returnables at its Columbus premises and Celadon employees would retrieve them. They were loaded by forklift and removed for future transport by Celadon or, at times, another motor freight carrier. The returnables, empty and lubricated with industrial solvents, were routinely shipped from Celadon's Columbus, Indiana facility to OIC Contract Services ("OIC") in Rocky Mount, North Carolina. At OIC, returnables were pressure-washed before being transported back to Cummins.

[4] On January 29, 2014, Wilkes, an over-the-road truck driver for Knight Transport ("Knight"), was dispatched to the Celadon yard to pick up a trailer filled with returnables for transport to OIC. A Celadon load coordinator directed Wilkes as to where to drop his empty trailer and where to find the loaded trailer for transport.

[5] The trailer, owned by Knight, had been loaded by Rick Wilson ("Wilson"), an employee of Celadon Trucking Services, Inc., a wholly-owned subsidiary of Celadon Group, Inc. Cummins did not supervise or direct the loading of the trailer. When deposed, Wilson could not recall the specifics of loading the

trailer in question, but described the methodology that was "the most common way to load these returnable trays" as "tapering the load," and elaborated:

> [It is] down-stacking towards the tail of the trailer. It's just a commonsense maneuver to keep the load stationary, keep the load from falling out, for the most part. …Typically the last stack [as compared to the middle and front of the trailer] is about half the size of the tallest stack. Sometimes we tier it [in] three stacks. In other words, you have a tall stack, one that's three-quarters of a stack and one typically about half that stack. It secures the load well.

(App. Vol. XII, pgs. 192-93.) Although Wilkes's freight may have been tapered, it was not bound, strapped, or shrink-wrapped.

[6] When Wilkes was directed to and approached the loaded trailer, the doors were open. He looked inside and saw stacks of trays rising almost to the top of the trailer. He observed nothing "outstanding," closed and locked the doors, and affixed a Knight seal on the trailer. (App. Vol. XIV, pg. 151.) Each of Knight's "dry trailers" has a vertical space for attaching straps; Wilkes did not add any strapping.

[7] En route, Wilkes did not feel the load shift to a degree that caused him concern. After arriving with the cargo at OIC, Wilkes parked his trailer as directed and began opening the trailer doors. He first raised a handle, which came up without incident. The first door was opened without Wilkes detecting undue pressure. However, as Wilkes began to slowly open the second door, he heard a noise "at the top of the door," saw a flash, and was struck by cascading trays.

*Id.* at 134. Wilkes sustained serious injuries, including a broken neck and brain trauma.

[8] On January 26, 2016, Wilkes filed a complaint against Cummins, Celadon, and various other defendants (who were subsequently dismissed by consent order). Therein, Wilkes alleged that Wilson, a Celadon employee, negligently loaded the subject trailer, the cargo shifted in transport, it came loose from its pallets, fell out of the truck, and cascaded onto Wilkes, severely injuring him. Wilkes further alleged that Wilson had been negligently hired, trained, and supervised.

[9] Cummins and Celadon moved for summary judgment, denying that either owed a duty of care to Wilkes. The trial court conducted a hearing on February 12 and June 25, 2018. On July 24, 2018, the trial court entered summary judgment in favor of both defendants, concluding that neither owed a duty of care to Wilkes. Wilkes now appeals.

# Discussion and Decision

## Standard of Review

[10] Summary judgment is appropriate only "if the designated evidentiary matter shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Ind. Trial Rule 56(C). We review de novo whether the trial court properly granted summary judgment. *Hughley v. State*, 15 N.E.3d 1000, 1003 (Ind. 2014).

[11] Further, "Indiana's distinctive summary judgment standard imposes a heavy factual burden on the movant to demonstrate the absence of any genuine issue of material fact on at least one element of the claim." *Siner v. Kindred Hosp. Ltd. P'ship*, 51 N.E.3d 1184, 1187 (Ind. 2016). Summary judgment is inappropriate if the movant fails to carry this burden. *Manley v. Sherer*, 992 N.E.2d 670, 673 (Ind. 2013). If the movant succeeds, the burden shifts to the non-movant to designate contrary evidence demonstrating the existence of a genuine issue of material fact. *Id.* In reviewing the grant or denial of summary judgment, we look only to the designated evidence, T.R. 56(H), and construe all factual inferences in favor of the party who did not seek summary judgment. *Manley*, 992 N.E.2d at 673. Where, however, the dispute is one of law rather than fact, we apply a de novo standard of review to the designated materials. *Kesling v. Kesling*, 83 N.E.3d 111, 116 (Ind. Ct. App. 2017).

[12] "To prevail on a theory of negligence, a plaintiff must prove: (1) that the defendant owed plaintiff a duty; (2) that it breached the duty; and (3) that plaintiff's injury was proximately caused by the breach." *Winfrey v. NLMP, Inc.*, 963 N.E.2d 609, 612 (Ind. Ct. App. 2012). Summary judgment is rarely appropriate in negligence cases. *Rhodes v. Wright*, 805 N.E.2d 382, 387 (Ind. 2004). "This is because negligence cases are particularly fact sensitive and are governed by a standard of the objective reasonable person – one best applied by a jury after hearing all of the evidence." *Id.* "However, a defendant may obtain summary judgment in a negligence action when the undisputed facts negate at

least one element of the plaintiff's claim." *Pelak v. Indiana Indus. Servs., Inc.*, 831 N.E.2d 765, 769 (Ind. Ct. App. 2005), *trans. denied*.[3]

## Duty Owed to Wilkes by Celadon

[13] According to Wilkes, Celadon owed him a duty of care in light of the following: Celadon controlled the loading; Wilkes was directed by a Celadon employee to retrieve a "ready to go" trailer; Wilkes (although an experienced driver) was unfamiliar with the characteristics of the cargo;[4] Celadon's un-trained[5] loader stacked greasy and unsecured trays to the top of the box trailer; and the weight and compactness of the ceiling-high stacks made a thorough inspection impractical or impossible.

[14] Appellees deny that they owed Wilkes a duty of care and focus upon Wilkes's duty of care for his own safety. They argue that the Federal Motor Carrier

---

[3] Findings of fact and conclusions of law are not required to support a summary judgment order; however, such may aid our review by providing the reasons for the trial court's decision. *Kesling*, 83 N.E.3d at 116. Here, the trial court adopted the proposed findings and conclusions of the Defendants. A continuing theme, renewed upon appeal, is that Wilkes failed to satisfy his burden of proof. According to Appellees, Wilkes lacks proof of specific acts of negligence, he failed to point to evidence that would be adequate to support a jury verdict, he failed to identify genuine issues of material fact, and cannot prevail at trial. However, summary judgment should not be used as an abbreviated trial, even where the proof is difficult, or the court may believe that the non-movant will be unsuccessful at trial. *BGC Entertainment, Inc. v. Buchanan*, 41 N.E.3d 692, 697 (Ind. Ct. App. 2015). According to Appellees, "Wilkes claims he was entitled to a trial on his negligence claims." Appellees Brief at 20. But this does not accurately reflect the issue before the trial court or this Court. Rather, the issue is whether Appellees were entitled to summary judgment and demonstrated their entitlement.

[4] He testified in deposition that he first believed the cargo to be metal parts but was later advised by an attorney that it was heavy plastic trays.

[5] Wilson testified in his deposition that he had "no formal training about distributing loads." (App. Vol. IV, pg. 103.)

Safety Regulations ("FMCSRs") applicable to motor carriers[6] squarely impose a non-delegable duty of inspection upon Wilkes. They direct our attention to 49 C.F.R. § 392.9(a), providing in relevant part:

> A driver may not operate a commercial motor vehicle and a motor carrier may not require or permit a driver to operate a commercial motor vehicle unless (1) the commercial motor vehicle's cargo is properly distributed and adequately secured[.]

49 C.F.R. § 392.9(b)(1) requires that a driver "assure himself that the provisions of paragraph (a) have been complied with," and 49 C.F.R. § 392.9(b)(2)-(3) require periodic cargo inspection. Nevertheless, subsection (b)(4) provides:

> The rules in this paragraph (b) do not apply to the driver of a sealed commercial motor vehicle who has been ordered not to open it to inspect its cargo or to the driver of a commercial motor vehicle that has been loaded in a manner that makes inspection of its cargo impracticable.

Appellees observe that these regulations impose no duty on shippers. They further observe that "regulations like the FMCSRs can establish the standard of care in state court proceedings." Appellees Brief at 37.

Wilkes concedes, as he must, that he had a duty to act reasonably for his own safety, consistent both with common law and federal regulations. But the dispositive inquiry remains -- whether another party also has a duty of care to

---

[6] A "motor carrier" is "a person providing motor vehicle transportation for compensation." 49 U.S.C. § 13102(14).

Wilkes. Appellees support their contention that they had no duty to Wilkes with a multi-faceted argument: Wilkes had an opportunity to inspect before he drove away; he failed to fulfill his primary responsibility; and Wilkes produced a deficient summary judgment record. In particular, the Appellees claim that Wilkes's designations in opposition to summary judgment were inadequate in that: "he designated no evidence that any Appellee assumed responsibility to secure Wilkes's cargo, no evidence that the load had been defectively placed in the trailer; no evidence that an experienced truck driver like Wilkes would have failed to appreciate any alleged defect, no evidence that anyone assured Wilkes that the load had been properly secured for him, and no evidence that Wilkes did not have an opportunity to inspect the load (which he, in fact, did)." Appellees' Brief at 25.

[18] Looking to the designated record in a light most favorable to Wilkes, the non-movant, and bearing in mind that no duty of coming forward with additional designated evidence could rightly be imposed upon Wilkes unless and until Appellees satisfied their prima facie burden, *Manley*, 992 N.E.2d at 673, we must determine whether Appellees are entitled to judgment as a matter of law. Indiana's Supreme Court has identified three factors frequently balanced in deciding whether a defendant owed a duty to a plaintiff to conform his conduct to a certain standard: (1) the relationship between the parties; (2) the reasonable foreseeability of harm to the person injured; and (3) public policy concerns. *Doe #1 v. Ind. Dep't of Child Serv.*, 81 N.E.3d 199, 206-7 (Ind. 2017). Whether a

defendant owes a duty of care to a plaintiff is a question for the court to decide. *N. Ind. Pub. Serv. Co. v. Sharp*, 790 N.E.2d 462, 466 (Ind. 2003).

[19]  Appellees assert that they established the lack of duty because (1) Indiana has adopted the *Savage* rule, *see United States v. Savage Truck Line, Inc.*, 209 F.2d 442 (1953) (apportioning a "primary duty" of safe loading to a motor carrier), and (2) Wilkes had an opportunity to inspect the cargo and could not claim the existence of a latent defect. In *Savage*, a truck driver for common carrier Savage was transporting a cargo of six airplanes encased in cylinders when one or more of the cylinders shifted and caused the vehicle to cross the double center line. A cylinder fell from the Savage truck and struck another truck, killing the driver instantly. *See id.* at 443. The cylinders had been loaded by agents of the United States; they had been fastened to the floor of the truck but not sufficiently to withstand the strain of transport.

[20]  In the consolidated trial of ensuing lawsuits, the trial judge held that agents of the United States had been negligent in failing to fasten the cylinders securely and Savage had been negligent in accepting the cargo for transportation and operating the truck with knowledge of the unsafe condition. *Id.* at 444. The cross appeals raised the matter of "respective liabilities of the United States and of Savage for the damages occasioned by each to the property of the other," which "turn[ed] on the rights and liabilities inherent in the carrier-shipper relationship between them in the interstate transaction upon which they were engaged." *Id.* at 444-45.

With reference to federal regulations, the *Savage* Court observed that common carriers are required to issue a bill of lading for property received for transportation in interstate commerce and are liable to the holder for damages to the property caused by the carrier and "[t]he exceptions to the rule of absolute liability are those which relate to losses arising from acts of God, acts of the public enemy, the inherent nature of the goods, and acts of the shipper." *Id.* at 445. The Court acknowledged that a carrier has a common law duty to "see that the packing of goods received by it for transportation is such as to secure their safety," and, moreover, federal regulations imposed upon motor carriers a duty of safe packing practices and securement and "no motor vehicle shall be drive[n] unless the driver shall have satisfied himself that all means of fastening the load are securely in place." *Id.* The Court then enunciated what has become known as the *Savage* Rule:

> The primary duty as to the safe loading of property is therefore upon the carrier. When the shipper assumes the responsibility of loading, the general rule is that he becomes liable for the defects which are latent and concealed and cannot be discerned by ordinary observation by the agents of the carrier; but if the improper loading is apparent, the carrier will be liable notwithstanding the negligence of the shipper.

*Id*. The appellate court found evidentiary support for the trial court's finding of negligence on the part of Savage, noting that agents of Savage had inspected the load, the driver concluded from his observation that the load was not properly fastened to the truck when he took charge of it, and he nevertheless drove as if conditions were normal, whereupon "the catastrophe ensued." *Id.* at 446.

[22]     The *Savage* rule arose from analysis of the FMCSRs, which supplement common law negligence principles.  The common law *Savage* rule has been applied to govern rights and liabilities among carriers and shippers but is not applied to negate a defendant's duty owed to innocent third parties.  *Bujnoch v. Nat. Oilwell Varco, L.P.*, 542 S.W.3d 2, 8 (Tex. Ct. App. 2017).

[23]     The Maine Supreme Court, in affirming a grant of summary judgment to the defendant upon an injured driver's claim of negligence against a shipping company that loaded a semi-trailer, explained its rationale for adoption of the rule:

> When the shipper assumes the responsibility of loading, the general rule is that he becomes liable for the defects which are latent and concealed and cannot be discerned by ordinary observation by the agents of the carrier; but if the improper loading is apparent, the carrier will be liable notwithstanding the negligence of the shipper.
>
> The policy behind the *Savage* rule is well founded.  The everyday practice and understanding in the trucking industry, as aptly reflected in the federal regulations on the subject, reflect that carriers logically should have the final responsibility for the loads they haul.  No shipper … can force a driver to accept a load that the driver believes is unsafe.  By the same token, a driver must take responsibility for the safety of his or her cargo by inspecting and securing the load.  The *Savage* rule does not absolve shippers from all responsibility as they bear the onus when cargo has been loaded improperly and that defect is latent.  The *Savage* rule simply extends the industry's reasonable understanding to negligence suits involving carriers and shippers.

… Most courts now accept the rationale of *Savage* and require carriers to take responsibility for the loads they carry, even if those loads have been improperly loaded by others.

The reasoning in *Savage* comports with the established duty of care notion that an injury must be foreseeable before a duty attaches. Here, the carrier has the opportunity to intercept any problem through inspection. In fact, the carrier's driver is under the obligation to conduct such a safety inspection pursuant to federal law. Carriers, through their drivers, must ensure the safety of their own loads, even when cargo is loaded by shippers. The *Savage* rule that imposes liability on carriers for the loading done by shippers, even when negligent, has been accepted by the majority of modern courts and by federal regulators. After considering both industry practice and traditional duty of care jurisprudence, we accept its reasoning as well. [The shipping company] may only be liable if [the plaintiff's] tractor trailer was loaded negligently and that negligence was undiscoverable through a reasonable safety inspection.

*Decker v. New England Public Warehouse, Inc.*, 749 A.2d 762, 765-67 (Me. 2000) (citations omitted). Two factors have been considered in determining whether a defect in a load is latent or open and obvious: the experience of the carrier and the presence or absence of assurances by the shipper as to the security of the load. *Vargo-Schaper v. Weyerhaeuser Co.*, 619 F.3d 845, 849 (8th Cir. 2010).

[24] The *Savage* rule has been considered not inconsistent with a comparative fault scheme. *See Spence v. ESAB Group, Inc.*, 623 F.3d 212, 220 (3rd Cir. 2010) (although *Savage* uses the terminology "primary" to refer to a carrier's duty to secure cargo, this is not deemed an "exclusive" duty and "a shipper may have

liability when an accident results from movement of goods during transport if the shipper created a non-apparent condition that caused the load to shift"). *See also Franklin Stainless Steel Corp. v. Marlo Transp. Corp.*, 748 F.2d 865, 870-71 (4th Cir. 1984) (holding that contribution between a defendant carrier and a defendant shipper was appropriate and recognizing that *Savage* contemplated contribution). That said, fault cannot be compared unless both parties are at fault and proving fault starts with establishing a duty.

[25] Our Indiana Supreme Court has not adopted the *Savage* rule[7] and we do not speculate whether the Court would find it incompatible with our comparative fault scheme. *See* Indiana Code Section § 34-51-2-6. But had the *Savage* rule been adopted, we would not find it dispositive of the heavy burden Appellees bore in the instant summary judgment proceedings. To negate the element of duty in Wilkes's negligence claim, it was not enough that Appellees show a duty, even a "primary" or regulation-imposed duty on the part of another. Rather, Appellees must affirmatively show the absence of their duty. Even under *Savage*, a duty will be imposed where a shipper was negligent "and that negligence was undiscoverable through a reasonable safety inspection." *Decker*, 749 A.2d at 767. To prevail, Celadon would have had to show that a fact-

---

[7] We observe that the Seventh Circuit cited with approval the *Savage* rule in a shipper-carrier liability case arising from events in Illinois. *Armour Research Found of Ill. Inst. of Tech. v. Chicago, R.I. & P.R. Co.*, 297 F.2d 176 (7th Cir. 1961).

Here, the trial court relied upon an unpublished Indiana decision recognizing adoption of the rule in Indiana to determine that the rule has application to the facts of this case. However, Indiana Appellate Rule 65(D) provides that memorandum decisions do not have precedential value.

finder could reach only a single conclusion, that is, no latent defect (one not evident upon reasonable inspection) existed.

[26] Celadon did not deny that its employee loaded a trailer with heavy, unsecured, stacked materials that were slick due to the presence of industrial lubricants. It neither confirmed nor denied that a tapering procedure had been utilized. The trailer was presented to Wilkes without either a specific warning or a specific representation of its safety. The door was open, and he was able to look inside. But a fact-finder might conclude that pulling apart the heavy stacks to determine their viscosity or an absence of proper tapering or restraints was impractical, as Wilkes claims. The opportunity for observation at the end of a trailer already completely stacked and overdue for delivery is not necessarily conducive to a full inspection and Wilkes may be found to have conducted what was a reasonable examination under the circumstances. For purposes of summary judgment, we accept Wilkes's version of events. That is, although he was an experienced driver, Wilkes was not familiar with the type of freight he was about to haul; he was unaware of a persistent problem (that is, an OIC employee testified in deposition that the returnables fell out "half the time," App. Vol. III, pg. 114), Wilkes's employer, Knight, was contacted to assist Celadon with its delivery obligations as would sometimes happen when Celadon was overburdened; Knight then dispatched Wilkes to pick up freight when the remaining time for anticipated delivery was already short; Wilkes was not present at loading as he might have been had Knight employees loaded the trailer; and he was afforded a cursory visual inspection at the point of and

expected time of departure. We cannot say, as a matter of law, that this sequence of events facilitated the realistic opportunity for inspection contemplated by the FMCSRs or common law principles. We will not employ either regulations or common law to extinguish all duty on the part of Celadon, who summoned Knight to act in assisting Celadon with its duties as a carrier for Cummins, and who exclusively loaded the freight.

[27] Finally, Appellees suggested that, even if a duty rested with one of them, Wilkes had to show how the cargo should have been handled under a standard of care in the industry, such as utilizing blocking and bracing. We acknowledge that, in *Spence*, a driver withstood a motion for summary judgment after offering testimony from an expert that the load should have been blocked and braced. This is not to say that a non-movant for summary judgment in Indiana is required to present such expert testimony at the summary judgment stage. Under Indiana's "distinctive" summary judgment standard and the "heavy burden" imposed, *Siner*, 51 N.E.3d at 1187, Appellees did not show that they complied with the standard of care in the industry. Further, the *Spence* Court observed "a shipper may also owe a duty of care depending upon the role it assumes in connection with loading and securing its cargo." 623 F.3d at 219.

[28] Celadon did not demonstrate that, as a matter of law, it owed no duty to Wilkes. Nor did Celadon demonstrate the absence of a genuine issue of material fact as to the remaining elements of breach of duty or proximate cause. The grant of summary judgment to Celadon must be reversed.

## Duty Owed by Cummins to Wilkes

Wilkes contends that Cummins owed him a duty because it owned the cargo and gave stacked, greasy trays to Celadon for transport. Cummins's designated summary judgment materials show that it placed the returnables in the exclusive control of Celadon. Thereafter, Cummins did not supervise or inspect the loading. Cummins made no representation to Wilkes that the trailer was safely loaded. Because Cummins did not have a relationship with Wilkes or any control over the instrumentality that allegedly caused him harm, Cummins did not owe Wilkes a duty of care. The trial court properly granted summary judgment to Cummins.

## Conclusion

The grant of summary judgment to Cummins is affirmed. The grant of summary judgment to Celadon is reversed. We remand for further proceedings consistent with this opinion.

Affirmed in part, reversed in part, and remanded.

Riley, J., and Pyle, J., concur.